The China Mutual Insurance Company et al., Respondents,
v. William M. Force et al., Appellants.

Where a charter party contains no provision for the payment of freight
*pro rata itineris,* but simply provides for payment on delivery of the
cargo at the port of discharge, freight is not earned except by perform-
ance of the voyage and delivery as specified.

This question is not affected by the "law of the flag" under which the
vessel sails. The obligation of the shipper is to be determined by the
law of the place where the contract of affreightment was made.

An Italian bark was chartered at New York to carry a cargo from that
city to Rangoon, Burmah. By the terms of the charter party the freight
was to be paid on delivery of the cargo at the port of discharge.
Plaintiffs insured the cargo. Defendants advanced moneys to the
master for necessary disbursements, who gave a draft for the amount,
pledging the vessel and freight for its payment This draft was for-
warded to Rangoon for collection. The vessel was wrecked, while upon
its voyage, on the coast of Burmah; it was abandoned and plaintiffs paid
as for a total loss Part of the cargo and of the ship's stores and furni-
ture was saved, and the salvor filed a petition for salvage in a court of
Rangoon of vice admiralty jurisdiction. Defendants' agent also filed a
petition in the same court, setting forth the facts and praying for an order
of arrest and sale of the ship, cargo, etc. An order of arrest and of sale
of the property salved was granted, the proceeds to be brought into
court, "reserving all questions as to the rights to salvage and of the
rights of the parties to the suit." Sale was made and the proceeds
deposited in court. Two orders were subsequently made by the court,
one in the proceedings first mentioned, decreeing that the salvor was
entitled to a sum stated , the other in the second proceeding, decreeing
payment of the balance of the proceeds of sale of cargo upon defend-
ants' claim, and payment was so made In an action to recover of
defendants the portion of the proceeds so paid to them, *held,* that while
said court had jurisdiction to seize, to order a sale and payment of sal-
vage, its decree summarily disposing of the surplus was not conclusive
against plaintiffs, who were not parties to the proceedings and had no
opportunity to be heard , that the effect of the sale was simply to dis-
charge all liens on the property and to transfer them to the proceeds ;
that the power of the court to act summarily against adverse parties,
without notice, was limited to the seizure and sale and the award of
salvage, and thereafter, although having possession of and jurisdiction
over the surplus, it was bound to proceed in some regular way and upon
some notice to determine who was entitled thereto , that, subject to the
claim for salvage, the proceeds of the sale of vessel and cargo belonged
to the owners and could not be disposed of on petition of a claimant,

without notice to them, giving them a day in court; that defendants had no lien upon the proceeds of the sale of the cargo, as the contract of affreightment was not performed and no freight was earned; and that as plaintiffs, by the abandonment and payment as for a total loss, succeeded to all the rights of the owners of the cargo, they were entitled to the surplus so paid over to defendants. ·

(Argued March 8, 1894; decided April 10, 1894.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made November 28, 1892, which affirmed a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

This action was brought by plaintiffs, insurers of the cargo of the bark *Guiseppe Anna,* to recover of defendants a portion of the proceeds of the sale of said cargo, which had been collected by their agent and paid to them.

The Italian bark " Guiseppe Anna " was chartered at the city of New York, in April 1889, through a charter party made between Daniel Bacon, a freight broker of that city, and John C. Seager, agent of the bark, of the same place, to carry a quantity of cases of oil from New York to Rangoon, Burmah, and a bill of lading was issued therefor. The plaintiffs insured the cargo. The defendants advanced moneys to the master for necessary disbursements about the vessel; who gave to them his draft for the amount advanced, and, for its payment, pledged the vessel and freight. This draft was forwarded to the Chartered Bank of India, Australia and China for collection and, by that bank, was sent to its agent at Rangoon. The vessel was wrecked in October, while upon its voyage, by perils of the sea, on the coast of Burmah, near Bassein. There was an abandonment and a payment, as for a total loss, and the ·plaintiffs, as insurers, succeeded to all the rights of the insured in respect of the cargo and its proceeds. One Anthony Murphy, the master of a steam vessel, had proceeded to the scene of the wreck and had been engaged for several weeks in salvage operations; but had succeeded in only saving part of the cargo and some of the ship's stores and

furniture. On December 16, 1889 he filed a petition for sal-
vage in the Recorder's Court of Rangoon; of vice admiralty
jurisdiction. On November 30th, 1889, the Chartered Bank
of India etc. had filed its petition in the same court, alleging
that it held the draft for, the advances to the master and
setting forth the wrecking of the vessel, the salvage effected
by Murphy and the possession of the receiver of wrecks for the
district and praying for an order of arrest and of sale of the ship,
cargo etc., and the condemnation of the ship in the amount due
the petitioner, subject to the claims of the salvor. Upon that
petition the recorder immediately ordered the arrest of vessel,
cargo, furniture, etc. On December 10th, 1889, he ordered a
sale at public auction of the property salved and that the
proceeds be brought into court; "reserving all questions as to
the rights of the government to be paid salvage and of the
rights of the parties to the suit." On December 18th, 1889,
the recorder ordered the vessel to be sold by the court's
bailiff in January, and the sale to be advertised in certain
papers. The advertisement is not shown in the record. Sale
was made and the proceeds deposited as a common fund, in
the registry of the court. On April 29th, 1889, the recorder
made two orders or decrees; one in the proceeding instituted
by the salvor, Murphy, against the vessel, by which he decreed
him to be entitled to a certain sum by way of salvage; the
other in the proceeding of the Chartered Bank of India etc.
against the vessel, by which he decreed the payment upon the
plaintiffs' claim of the surplus proceeds in the registry of the
court, after satisfying the claim of the salvor. This action was
brought by the insurers of the cargo to recover of the defend-
ants the portion of the proceeds of the sale of the cargo etc.,
which had been collected by their agent and paid to them.
The theory of the action is that, as no freight had been earned,
no lien attached in favor of the defendants through the
master's draft, which was enforcible against the proceeds of
the admiralty sale, and, hence, they were not entitled to retain
the moneys paid to their collecting agent, under the decree of
the recorder of Rangoon. The defendants defended the

action, upon the ground that the decree of the recorder is conclusive and could not be reviewed here; and they also say that the vessel sailed under the flag of Italy and was owned by a subject of the Italian government and that, therefore, questions relating to reciprocal rights of vessel and cargo, in the absence of some express agreement otherwise, were governed by Italian law; which allows of a lien upon cargo *pro rata itineris.* The evidence upon the trial was wholly documentary; introducing the record of the proceedings had in the Recorder's Court of Rangoon.

The plaintiffs had judgment below in the trial court, which was affirmed by the General Term, and the defendants now appeal to this court.

*Harrington Putnam* for appellants. The decree of the recorder of Rangoon was rendered by a court of competent jurisdiction, and cannot be impeached collaterally, but is conclusive until set aside or reversed by the same court or some court having appellate jurisdiction. (*Dobson* v. *Pearce,* 12 N. Y. 156; *Smith* v. *Nelson,* 62 id. 286; *C. Co.* v. *Dimock,* 90 id. 33; *Ins. Co.* v. *Hodgson,* 7 Cranch, 332; *Hendrickson* v. *Hinckley,* 17 How. Pr. 443, 445.) The decree was rendered by the court proceeding in admiralty and *in rem,* and is, therefore, conclusive with respect to the money in question. (*Gelston* v. *Hoyt,* 3 Wheat. 246; *O. Ins. Co.* v. *Francis,* 2 Wend. 64, 68; *Monroe* v. *Douglas,* 4 Sandf. Ch. 126, 183; *Castrique* v. *Imrie,* L. R. [4 H. L.] 414; *Black on Judg.* § 813; *Windsor* v. *McVeigh,* 93 U. S. 274.) The decree of the court of the recorder of Rangoon was in accordance with the law and justice of the case. (*The Soblomston,* L. R. [1 Ad. & El.] 293; *Lloyd* v. *Ginbert,* 6 B. & S. 100.) The decree attacked stands entitled to the emphatic statement of the conclusiveness of foreign judgments declared by this court in the cases of *Dunstan* v. *Higgins* (138 N. Y. 70); *Castrique* v. *Imrie* (L. R. [4 H. L.] 414).

*William W. MacFarland* for respondents. In the absence of a contract to the contrary, freight is not payable *pro rata*

*itineris.* (Carver on Carriage by Sea, § 547; 1 Pars. Mar. Law, 158; Maclachlan on Merchant Shipping, 394; *The Tornado,* 108 U. S. 347; *N. Y. C. & H. R. R. R. Co.* v. *S. O. Co.,* 87 N. Y. 486; *Hubbel* v. *G. W. Ins. Co.,* 74 id. 246; *Miston* v. *Lord,* 1 Blatchf. 355; *Sampayo* v. *Salter,* 1 Mason, 42; *The Ship National Hooper,* 3 Sumn. 542.) The charter was made in the city of New York for a voyage to Burmah between persons residing in New York. That being the place of the contract it must be construed in respect to rights and obligations according to the law of that place, in the absence of any provision to the contrary. (*Dyke* v. *E. R. Co.,* 45 N. Y. 113; *Faulkner* v. *Hart,* 82 id. 413; *L., etc., Co.* v. *P. Ins. Co.,* 129 U. S. 397.) There was no decree, even in form, as to the ownership of the money remaining in the registry of the court after the payment of salvage. In such cases the question of title to the proceeds (called remnants) arises later on, and has no relation to the sale of the salved property, and payment of salvage. A maritime lien upon the balance in the registry existed in favor of the true owners. (*Sheppard* v. *Taylor,* 5 Pet. 675; *McLane* v. *U. S.,* 6 id. 404; *M. S. Ins. Co.* v. *The Brig George,* Olcott, 89; *Brackett* v. *The Hercules,* Gilpin, 184; Black on Judg. § 183; *Reynolds* v. *Stockton,* 140 U. S. 265; *Durant* v. *Abendroth,* 97 N. Y. 133.) The defendants have money in their hands justly belonging to the plaintiffs, which they are entitled to recover. (*Tugman* v. *N. S. S. Co.,* 76 N. Y. 210.)

Gray, J. The principal question, which is presented for our consideration, relates to the effect which should be allowed to the decrees of the Vice Admiralty Court in Rangoon. No question is made about its exercise of jurisdiction in seizing and ordering the sale of the vessel, cargo etc.; neither is any question made as to the rights of the salvor to receive salvage moneys out of the fund in the registry of the court. The question is whether, after seizure and sale of the property and the award of salvage moneys, the Admiralty Court could summarily proceed upon the application of the Chartered Bank of

India etc., as it did, with respect to the surplus moneys in its registry. Was its decree as to that matter conclusive upon these plaintiffs and are they debarred from setting up that, however conclusive may have been its decree with respect to the sale of the property, or the award of salvage moneys, they are not concluded from inquiring into the sufficiency of the proceedings to divest them of their proprietary interest in the remainder of the proceeds. After the best consideration I have been able to give to the subject, I think these questions are to be answered in the negative. I am not aware that any rule of the Admiralty Law requires us to answer them otherwise, and although the proceeding was *in rem*, nevertheless, the court was bound to proceed, in the determination of rights to the proceeds, by proper judicial proceedings; without which its decree could not, and ought not to be conclusive. Mr. Justice Story observed in *Bradstreet* v. *Neptune Ins. Co.* (3 Sumn. 600), with respect to an essential element for the conclusiveness of a foreign judgment: "That element is that there have been proper judicial proceedings upon which to found the decree;" and he proceeds to describe them, mentioning the necessity of personal or public notice of the proceedings so that the parties in interest may have an opportunity to be heard. Other than what the seizure of the vessel, cargo etc. is deemed to import to the world, there was no notice of any kind to the owner of either and if any publication was made in the whole proceeding, it was under an order directing the bailiff to advertise his sale in certain newspapers. Beyond the petition of the Chartered Bank for the condemnation of the vessel and the order for the payment of the petitioner from the proceeds, subject to the salvor's claim, the foreign record does not disclose any process or proceeding for the determination of the question of its right. Was this record sufficient to show that the court competently exercised its jurisdictional powers, so as to bind parties with adverse interests by its decree? I think not. The proceeding before the admiralty court was against the vessel, cargo etc., and jurisdiction was acquired by their seiz-

ure ; which is supposed to constitute due notice to all parties interested and to empower the court to order the disposition of the property seized. It proceeded to order a sale of the vessel, cargo etc., to protect all interests therein, and ·the effect of the sale was to discharge all liens and to transfer them to the proceeds. The sale passed the title to the property sold as to all the world ; although the owners did not appear, and were not heard. The judgment of the court acting *in rem*, by general maritime law, extinguished the title of the owner and is conclusive upon the title, transfer and disposition of the property itself, in whatever place it may be found, and by whomsoever it may be questioned. These principles of admiralty law have been long settled and are too familiar to need the citation of authorities.

There is no dispute here about the competency of the court in Rangoon to act upon the property and to sell it ; nor, when the proceeds came into its registry, to direct the payment thereout of the salvor's claim. The difficulty is to see upon what legal principle the court could dispose of the surplus proceeds remaining in the registry, without adjudging as to the title to them, in some manner which would exhibit an observance of essential legal processes. I think that the power of the court to act competently in a summary manner, as against adverse parties without notice, was limited to the seizure and sale of the property and the award of salvage moneys to the salvors. Thereafter, the court, though in possession of and with jurisdiction over the fund, was bound to proceed in some regular way and upon some notice, in order to determine the relative claims of owners and claimants. I am quite unable to see how the mere order to pay the claim out of the surplus moneys is equivalent to an adjudication, which we must regard as conclusive in its nature. After ordering the sale of the property and adjudging upon the salvor's claim, the question of the right of the Chartered Bank to be paid from a fund, which belonged to others, was one *inter alios* and in justice and in reason, as it seems to me, those other parties should have had their day in court. Subject to·

the claim for salvage, the proceeds of the sale of the con-
demned property belonged to the owners of the vessel and
cargo; whatever the liens against them. The principle of a
jurisdiction in a court of admiralty power to act summarily
and conclusively, without actual notice to parties interested in
the property, would seem to have been sufficiently satisfied in
the proceedings in question, without extending it so as to per-
mit a disposition of these surplus moneys, upon the mere
petition of a claimant and without notice of any description.
The 43d rule, of the admiralty rules adopted by the United
States Supreme Court in 1844, reads that "any person having
an interest in any proceeds in the registry of the court shall
have a right by petition, or otherwise, to intervene *pro inter-
esse suo* for a delivery thereof to him; and upon due notice
to the adverse parties, if any, the court shall and may proceed
summarily to hear and decide thereon and to decree therein
according to law and justice." These rules represent the
general course of admiralty practice, as it came to us from the
civil law courts, as modified in English courts, and were
intended to be in general harmony with the practice in the
maritime courts of other nations. (See Benedict's Adm. §§ 11,
356; Henry's Adm. Pr. § 114.)

The spirit of the rule referred to makes notice necessary to
a valid decree, disposing of proceeds remaining in the regis-
try of the court, and the appropriateness of its application is
not affected by the fact that the claimant here was already in
court by its proceeding against the vessel. This surplus of
proceeds, in the registry of the court, belonged, in legal con-
templation, to the original owners of vessel and cargo, and
were there for distribution only. It was the duty of the court
to preserve them for all who had claims upon them; and if it
allowed claims to be paid, before the legal right of a claimant
was established by due process of law, "it would be nothing
else than allowing a man's property to be taken from him
without his consent and without judgment of law." (*The
Phebe*, 1 Ware's Rep. 360, 365.) It was remarked in *Harper*
v. *The New Brig* (Gilpin's Rep. at p. 546) that "the power

of a court of admiralty over these remnants, or surplusses, is not an arbitrary power, but is governed by principles, which the court is bound to observe before it acts, whether there be or be not a party in court, having an interest or disposition to obtain a proper distribution of them." So far as this foreign record shows, the decree was *ex parte*, upon the petitioner's statement, and seems as little entitled to be regarded as conclusive, as the sentence, commented upon by Mr. Justice Story, in *Bradstreet* v. *Neptune Ins. Co.* (*supra*). Upon authority, as well as upon principle, I think, while the admiralty court retains jurisdiction over the disposition of the proceeds remaining in its registry, after satisfying the purpose for which its jurisdiction was originally called into exercise, which was, I consider, here the sale of the vessel and property saved and payment of the salvors, that jurisdiction is competently exercised only upon due process of law, by which parties having adverse interests are given an opportunity to be heard. In *The Sybil* (4 Wheat. 98), after salvage had been decreed out of proceeds, a claim was interposed by the ship owners for freight and average. Mr. Justice Johnson, observing that the court was pretty well satisfied that no freight was earned and that average might have been claimed, said, " in the case then depending, the Circuit Court could not have awarded either of those demands. The question is *inter alios*. There was no pretext for claiming either as against the salvors and the ship owners ought to have pursued their rights by libel, or petition by way of libel, against the portion of the proceeds of the cargo which was adjudged to the shippers. These parties were entitled to be heard upon such a claim and could only be called upon to answer in that mode." In *Andrews* v. *Wall* (3 How. U. S. at p. 573), Mr. Justice Story said : " This is a case of proceeds rightfully in the possession and custody of the admiralty ; and it would seem to be, and we are of opinion that it is, an inherent incident to the jurisdiction of that court, to entertain supplemental suits by the parties in interest, to ascertain to whom those proceeds rightfully belong, and to deliver them over to the parties who establish the law-

ful ownership thereof. This is familiarly known and exercised in cases of the sales of ships to satisfy claims for seamen's wages, for bottomry bonds, for salvage services, and for supplies of materialmen, where, after satisfaction thereof, there remain what is technically called 'remnants and surplusses,' in the registry of the admiralty." If these defendants had a maritime lien, which survived the destruction of the vessel, and they had some proprietary interest in the proceeds in the registry of the court, the general rule, as stated by Mr. Benedict, in his work on admiralty, (§ 305) required that "before the proceeds are distributed, the court on proper proceedings for such purpose, should adjudicate upon the claims to such proceeds arising from liens upon them."

In *Sheppard* v. *Taylor* (5 Peters, 675, 711), it was remarked, with respect to the lien for the wages of seamen upon proceeds, that "it is the familiar practice of the court to exert its jurisdiction over them, by way of monition to the parties holding the proceeds;" who, in that case, were the assignees of the owners.

I think our conclusion must be that the order or decree of the Vice Admiralty Court in Rangoon, directing the payment from the proceeds in its registry of the demand of the Chartered Bank, was not conclusive upon these plaintiffs. There was no actual adjudication upon the question of title, through those proceedings which are recognized to be proper, whether in admiralty, at common law, or in equity. That the decree of a foreign court of admiralty is conclusive, upon the point on which the condemnation of the property rested, is not to be disputed; but that it may decree conclusively upon other points incidental to the distribution of the proceeds, without some proper proceedings giving support to the decree, I am not prepared to admit.

Having reached that conclusion, there remains the question whether the defendants are not, nevertheless, entitled to retain the moneys so awarded to them. They say that they had a legal lien upon the cargo for proportional freight. The charter party provided for the payment of freight upon delivery of

cargo at port of discharge. It is well settled that, unless the contract of parties provides for the payment of freight *pro rata itineris*, it is not earned except by a performance of the voyage and the delivery of the cargo at the place of destination. (*The Tornado*, 108 U. S. 342; *N. Y. C. & H. R. R. R. Co.* v. *Standard Oil Co.*, 87 N. Y. 486.) I see nothing in this case to warrant us in saying that the facts constituted any exception to that rule. Nor is the question affected by the "law of the flag," as the defendants have argued. The fact that the vessel was Italian does not subject the contract of shipment to the operation of the Italian Commercial Code. The obligation of the shippers of the cargo is to be determined by the law of the place, where the contract of affreightment was made. In the case of the *Liverpool Steam Co.* v. *Phenix Ins. Co.* (129 U. S. 397), an action brought by an insurance company claiming to be subrogated to the rights of owners of goods on board the "Montana," a British vessel, the question was elaborately discussed, in an opinion by Mr. Justice Gray, whether, where a contract was made in New York for the shipment upon a British vessel of goods to Great Britain, where the damage itself occurred, questions arising upon the contract should be determined by British law. Many cases in English and American courts were reviewed, including that in this court of *Dyke* v. *Erie R. Co.* (45 N. Y. 113), and, upon the great preponderance, if not the uniform concurrence of authority, it was held that the nature, obligation and interpretation of the contract are to be governed by the law of the place where it is made. " A contract of affreightment," it was said, " made in a country between citizens, or residents thereof, and the performance of which begins there, is to be governed by the law of that country, unless the parties   *   *   *   clearly manifest a mutual intention that it shall be governed by the law of some other country." (And see *Faulkner* v. *Hart,* 82 N. Y. 413.)

For the reasons expressed, I think the judgment appealed from should be affirmed, with costs.

All concur.

Judgment affirmed.