THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY V. HUTCHINGS, SEALY & CO., *a Partnership, etc.*

No. 15,431. ( 99 Pac. 230.)

SYLLABUS BY THE COURT.

1. PETITION—*Construction—Action ex Contractu or ex Delicto.* Where a petition contains a good cause of action for a breach of contract the addition of words or averments which are appropriate to a cause of action for a wrong will not change the action from contract to tort. And in case of doubt the courts are inclined against construing the pleading as embodying a cause of action for a tort.

2. CARRIERS—*Bills of Lading—Possession of the Property—Innocent Purchaser.* Whether the agents of a common carrier have authority to bind the carrier by the issue of bills of lading when the property is not in the possession of the carrier is a question upon which two antagonistic doctrines prevail: (*a*) One holds that it is not within the scope of the authority of an agent of a common carrier to issue a bill of lading without the actual receipt of the goods, and that the bill of lading so issued conveys no rights to an innocent holder thereof. This rule obtains in the federal courts, and in many of the state courts. (*b*) The second holds the carrier liable because the knowledge whether the goods have been received, and therefore the power in fact conferred, lies peculiarly with the carrier's agent, who is held out to the public as having authority to make a statement upon which innocent parties may rely, and the carrier is therefore estopped to deny the receipt of the goods as stated in the bill. This doctrine, resting upon the principle of estoppel *in pais,* is the law in Kansas, as declared in *Savings Bank v. A. T. & Santa Fé Rld. Co.,* 20 Kan. 519.

3. CONTRACTS—*Bills of Lading—Proper Law of the Contract.* In an action against a common carrier based upon bills of lading, involving no question with respect to the right of the carrier to limit its common-law liability, the rights and obligations of the parties are to be determined by the law of the place where the contract was made.

4. ——— *Action to Recover Money Advanced on Bill of Lading Issued without Possession of Property—Defense.* In an action against a common carrier to recover moneys advanced on the faith of bills of lading issued by the agents of the carrier without the actual receipt of the property an answer which alleges that the bills were executed and delivered in the state

Railway Co. v. Hutchings.

of Missouri, that when they were issued the statutes of that
state made it unlawful for a common carrier to issue bills of
lading without the actual receipt of the property, and that
the supreme court of Missouri has held and still holds, in
construing the statute, that all such bills of lading are abso-
lutely void and that no action can be maintained thereon by
any holder or assignee, states a good defense as against a
demurrer.

5. EVIDENCE—*Judicial Notice—Law of Another State.* The
courts of this state can not take judicial notice of the laws
of another state, except for the purpose of aiding them in
ascertaining and interpreting the laws of this state on a par-
ticular subject; and the situation is not changed nor the
rule altered by the fact that a pleader who relies upon the law
of another state has referred to a particular decision of the
supreme court of that state, citing the volume and page of
the reports where the decision may be found.

Error from Labette district court; THOMAS J. FLAN-
NELLY, judge. Opinion filed November 7, 1908. Re-
versed.

STATEMENT.

THIS action was commenced in the district court of
Labette county, on March 29, 1905, to recover moneys
advanced on certain bills of lading issued by the de-
fendant, the Missouri, Kansas & Texas Railway Com-
pany, to J. K. Davidson & Co. and assigned to the plain-
tiffs.

The defendant operates a line of railway extending
from Kansas City, Mo., to Galveston, Tex. In June,
1900, the plaintiffs, Hutchings, Sealy & Co., were en-
gaged in the grain business in Galveston, Tex., and one
J. K. Davidson, doing business as J. K. Davidson & Co.,
was engaged in the grain business in Kansas City, Mo.
The manner in which the business was carried on
among the plaintiffs, J. K. Davidson & Co., and the de-
fendant was alleged to be as follows: The defendant
would issue to J. K. Davidson & Co. at Kansas City a
bill of lading for each car of bulk wheat. Davidson
& Co. would assign this bill of lading to the plaintiffs

and draw a sight draft upon them, depositing the same in a bank at Kansas City. Upon presentation to the plaintiffs at Galveston they would honor the draft upon the faith and strength of the bill of lading attached. Ordinarily the time occupied in transit of a car of grain between Kansas City and Galveston was about two weeks. The method of doing the business was well known to the defendant, and was adopted by the parties for the purpose of enabling Davidson & Co. to purchase other grain for shipment over defendant's railway, and thus increase the volume of business and benefit all the parties.

It was alleged in the petition that on or about June 13, 1900, defendant issued twenty-seven bills of lading of this kind to J. K. Davidson & Co., each reciting that a car-load of bulk wheat containing a certain number of pounds was loaded in a car of the defendant, stating the number of the car, and was to be transported from Kansas City to Galveston and delivered to the order of Davidson & Co.; that across the face of each bill of lading there were written the letters "S. O.," meaning that the bill of lading was consigned to shipper's order, and therefore negotiable; that such meaning was well known to all persons and railway companies engaged in the shipment of grain. It was further alleged that the several bills of lading were issued at Kansas City and signed by F. A. Leland, who at the time was the assistant general freight agent of the defendant company, that he signed the same as such agent, being the duly authorized agent of the defendant in that behalf, and that the plaintiffs were not informed and could not state the name of the person or persons who delivered the several bills of lading to J. K. Davidson & Co. There were also allegations that these bills of lading were all indorsed by J. K. Davidson & Co., and that the plaintiffs, upon the faith and strength of the recitals therein contained, advanced certain sums of money; that in truth and in fact the recitals contained in the several bills of lading were false, no bulk wheat having

been received or loaded in any cars of the defendant, and no such cars having been received by the plaintiffs from J. K. Davidson & Co. nor transported or delivered to the plaintiffs by defendant. The amount of money advanced by the plaintiffs was set forth and it was alleged that of this sum there had been collected from J. K. Davidson & Co. certain amounts, leaving a balance due of $4815.95.

The petition then recited that the plaintiffs, on June 30, 1900, commenced an action in the circuit court of Jackson county, Missouri, a court of competent jurisdiction, against the defendant railway company, the general object and nature of which was to recover from defendant the damages sued for in this action; that from time to time, by the agreement of the parties thereto, that action was continued for the purpose of enabling the plaintiffs to recover whatever might be possible from Davidson & Co.; and that the action was afterward dismissed without prejudice to a new action. Attached to the petition as exhibits were copies of the various bills of lading, together with a copy of the petition in the action brought in Missouri, and copies of two written stipulations for the continuance of that action.

A general demurrer to the petition was overruled, to which defendant excepted. An answer was then filed setting up a number of defenses. The plaintiffs demurred to the ninth and tenth defenses of the answer, which the court sustained. The defendant excepted, and brings the cause here for review upon the rulings of the court upon the demurrers.

*John Madden,* and *W. W. Brown,* for plaintiff in error.

*F. M. Harris,* for defendants in error.

The opinion of the court was delivered by

PORTER, J.: The first question raised by the defendant to the petition—that by virtue of chapter 325 of the Laws of 1905 the action can not be maintained by

the plaintiffs because they are non-residents of the state—is easily answered. Without attempting to pass upon any of the provisions of the act' it is sufficient to say that it has no application, for the reason that this action was brought on the 29th day of March, 1905, and the act in question did not take effect until June 8, 1905.

It is contended that the demurrer to the petition should have been sustained because it appears upon its face that the action was barred by the statute of limitations, the petition averring that the plaintiffs first discovered in the month of June, 1900, that the statements contained in the bills of lading were false, and the action, therefore, should have been brought within two years. It is also contended that the petition shows an election of a different and inconsistent remedy by the commencement of the action in Missouri. These contentions both rest wholly upon the claim that the action is in tort and not on contract. If it is not an action based upon fraud the two-year statute of limitations has no application; if it is on contract the five-year statute controls, and as the action was commenced within that time it was not barred. Likewise, if it is an action on the contract the question of election of inconsistent remedies is not involved, because it is conceded that the action referred to in the petition as having been brought in Missouri was an action directly on the contract to recover the amount of money advanced on the bills, and therefore they would not be inconsistent.

The first question for us to determine, therefore, is whether this is an action *ex delicto* or *ex contractu.* By the common law a bill of lading conferred upon the assignee only the title to the property of which it was the evidence, and the shipper might sue the carrier for damage to the goods regardless of whether he had any property in them or not. When he assigned the bill of lading he parted with none of his original rights

Railway Co. v. Hutchings.

under the contract, except the right of possession of
the goods. The assignee could bring no action against
the carrier for damage to the goods on the contract of
shipment. (1 Hutch: Car., 3d ed., § 197.) The assignee
could, however, have his action in trover or replevin,
because of his right to possession. (*Thompson v. Dom-*
*iny,* 14 M. & W. [Eng.] 402.) The English statute
making bills of lading negotiable altered the common-
law rule. In this country, wherever the assignment
of a chose in action carries with it the right to sue
thereon, the assignee may of course maintain an action
in his own name for any breach of the contract. He
may bring trover or sue for conversion or in replevin,
and these would be actions in tort; but where he sues
for money advanced on the faith of the bill of lading
the action, we think, is an action on the contract.

In the petition in this case there are averments
which are sufficient to set up a cause of action for a
breach of contract; and there are averments that the
bills were issued fraudulently, and that by reason
thereof the plaintiffs suffered damage, but these latter
may be regarded as merely statements averring a
breach of the contract, for it sufficiently appears that
the action is solely to recover the amount advanced
upon the faith of the statements contained in the con-
tracts. The doctrine is well settled that where a peti-
tion contains a good cause of action for a breach of
contract the addition of words or averments which are
appropriate to a cause of action for a wrong will not
change the action from contract to tort. (2 Beach,
Mod. Law of Cont. § 1679, note.) And in case of doubt
the courts are inclined against construing the pleading
as embodying a cause of action for a tort. (*Goodwin*
*et al. v. Griffis,* 88 N. Y. 629; *Austin v. Rawdon,* 44
N. Y. 63.) This being an action on contract, the five-
year statute applies; and both actions being on con-
tract, and on the same contracts—to recover the moneys

advanced on the faith of the bills of lading—they are not inconsistent.

The main contention, however, raised by the demurrer to the petition is that the defendant can not be held liable because only the receipt of the goods confers power on the agent to issue the bills. Two antagonistic doctrines prevail on this question. In the commercial country of England the rule contended for by the defendant is supported by an unbroken line of authorities. (*Grant v. Norway*, 10 C. B. [Eng.] 665; *Hubbersty v. Ward*, 8 Ex. [Eng.] 330; *Cox v. Bruce*, 18 Q. B. Div. [Eng.] 147.) The same rule likewise obtains in the federal courts (*Pollard v. Vinton*, 105 U. S. 7, 26 L. Ed. 998; *Schooner Freeman, &c. v. Buckingham et al.*, 59 U. S. 182, 15 L. Ed. 341; *Friedlander v. Texas &c. Railway Co.*, 130 U. S. 416, 9 Sup. Ct. 570, 32 L. Ed. 991; *Missouri Pacific Railway v. McFadden*, 154 U. S. 155, 14 Sup. Ct. 990, 38 L. Ed. 994) and, according to the text-writers, is supported by an overwhelming weight of authority. The cases holding this view make no distinction between bills of lading issued fraudulently or collusively, or by mistake. The reasoning upon which the doctrine rests is usually based on the question of agency, and the proposition that railway companies are not dealers in bills of exchange nor in bills of lading; but are carriers only. So, where a bill of lading has been issued by an agent of the carrier without receipt of goods by the carrier, the argument is that the extent of his authority, real or apparent, is to issue such bills only for freight actually received, and that it is not within the scope of his authority to issue a bill of lading except when the merchandise is actually delivered. Referring to the characteristics of a bill of lading, Mr. Justice Miller, in *Pollard v. Vinton*, 105 U. S. 7, 26 L. Ed. 998, used this language:

"Notwithstanding it is designed to pass from hand to hand, with or without indorsement, and it is effica-

Railway Co. v. Hutchings.

cious for its ordinary purposes in the hands of the
holder, it is not a negotiable instrument or obligation
in the sense that a bill of exchange or promissory note
is. Its transfer does not preclude, as in those cases,
all inquiry into the transaction in which it originated,
because it has come into hands of persons who have
innocently paid value for it. The doctrine of *bona
fide* purchasers only applies to it in a limited sense."
(Page 8.)

The courts holding this doctrine say that the receipt
for the goods may always be explained or contradicted
the same as any other receipt; that the agent of the
railway company or common carrier has been clothed
by his principal with the power to issue bills of lading
only for goods received for transportation; that he is
held out to the world by his principal as having this
authority, and no other; and that, where it is known
that the authority of an agent can only be exercised
upon the occurrence of certain conditions, the persons
seeking to bind the principal by the acts of the agent
must ascertain whether the facts exist which call into
exercise the authority of the agent. Referring to the
hardships of the rule, Mr. Chief Justice Fuller, in
*Friedlander v. Texas &c. Railway Co.,* 130 U. S. 416,
9 Sup. Ct. 570, 32 L. Ed. 991, used this language:

"The law can punish roguery, but can not always
protect a purchaser from loss, and so fraud perpe-
trated through the devise of a false bill of lading may
work injury to an innocent party, which can not be
redressed by a change of victim." (Page 426.)

The contrary doctrine may be stated as follows: The
carrier is held liable upon the theory that the knowl-
edge whether the goods have been received, and there-
fore the power in fact conferred, lies peculiarly with
the agent of the carrier; that one of the purposes for
which the agent is employed is to state in the bill of
lading the fact of the receipt of the goods therein de-
scribed; and, where the railway company or other

carrier holds an agent out to the public as having authority to make a statement upon which innocent parties may rely, the company should not be permitted to deny the receipt of the goods as stated in the bill. The action of the carrier in thus holding its agents out to the public as having authority to issue such bills, and putting it in the power of the holder to treat with innocent purchasers on the representations of the bills, is held to constitute an estoppel *in pais*. The doctrine rests also for its support largely upon the *quasi*-negotiability of bills of lading and the commercial necessities for the rule growing out of the usual method of transacting business of this character, and the mutual advantages which the shipper, carrier and the public derive therefrom.

At a comparatively early period of its history this court, in *Savings Bank v. A. T. & Santa Fé Rld. Co.,* 20 Kan. 519, announced its adherence to what may be regarded as the more modern doctrine, and the one which in our opinion accords with the better reasoning. In that case Mr. Chief Justice Horton, speaking for the court, said:

"Our state is a great producer of grain, large amounts of which seek markets outside of its boundaries. The means of its transportation are mainly limited to railroads, and commercial transactions by our grain dealers extend to millions each year. The great mass of these products, when started to eastern markets, are purchased and paid for through bills of lading. The custom of grain dealers is to buy of the producer his wheat, corn, barley, etc., then deliver the same to a railroad company for shipment to market. The railroad company issues to the shipper its bill of lading. The shipper takes his bill of lading to a bank, draws a draft upon his commission merchant, or consignee, against the shipment, and attaches his bill of lading to the draft. Upon the faith of the bill of lading, and without further inquiry, the bank cashes the draft, and the money is thus obtained to pay for the grain purchased, or to repurchase other shipments. In this way, the dealer realizes at once the greater value of his

consignments, and need not wait for the returns of the sale of his grain. to obtain money to make other purchases.    In this way the dealer with a small capital may buy and ship extensively; and while having a capital of a few hundred dollars only, may buy for cash, and ship grain valued at many thousands.   This mode of transacting business is greatly advantageous both to the shipper and producer.   It gives the shipper who is prudent and posted as to the markets almost unlimited opportunities for the purchase and shipment of grain, and furnishes a cash market for the producer at his own door.   It enables the capitalist and banker to obtain fair rates of interest for the money he has to loan, and insures him, in the way of bills of lading, excellent security.   It also furnishes additional business to railroad companies, as it facilitates and increases shipments of produce to the markets.   A mode of business so beneficial to so many classes ought to receive the favoring recognition of the law to aid its continuance; and the later decisions have gone very far to strengthen the *quasi*-negotiability of bills of lading, independent of any statutory authority."    (Page 522.)

The following, among other authorities, support this doctrine: *Armour et al. v. Michigan Central R. R. Co.*, 65 N. Y. 111, 22 Am. Rep. 603; *Bank of Batavia v. N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440; *Brooke v. N. Y., Lake Erie and West. R. R. Co.*, 108 Pa. St. 529, 1 Atl. 206, 56 Am. Rep. 235; *S. C. & P. R. R. Co. v. First National Bank,* 10 Neb. 556, 7 N. W. 311, 35 Am. Rep. 488; *St. L. & I. M. R. R. Co. v. Larned,* 103 Ill. 293.   Other courts have approved the reasoning, although they have adopted the contrary view on account of their desire to follow the decisions of the federal courts and prevent a conflict of authority on questions of commercial law within their states.   (*National Bank of Commerce v. Chicago, Burlington & N. R. Co.*, 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. Rep. 566.)

It is insisted by the defendant that, while the case of *Savings Bank v. A. T. & Santa Fé Rld. Co., supra,* may rest upon the better reasoning, still in view of the

fact that one of the greatest commercial nations of the world has approved the contrary doctrine, and especially because our federal courts have established a different rule, which is followed in so many of the states, therefore in the interests of uniformity the doctrine declared in that case should be changed. It is true that inconvenience and confusion frequently follow from having two conflicting rules on the same question in the same state, owing largely to the fact that the federal courts refuse to follow the decisions of the state courts on questions of so-called general commercial law, but determine the law according to their own views of what the law is. The conflict, however, is irreconcilable. No uniform rule with respect to commercial law can be gathered from the decisions of the courts of this country or of England. Some of the ablest state courts refuse to recognize any distinction between the binding effect of decisions on commercial law and decisions construing statutes, and hold that the so-called commercial law derives whatever force it has from its adoption by the state as part of the common law and that a rule of law declared by the state courts to govern contracts made within their jurisdiction is conclusive everywhere, just as it is universally conceded that the decisions of state courts construing their own statutes are binding on all other courts. In the case of *Forepaugh v. Railroad Co.*, 128 Pa. St. 217, 18 Atl. 503, 5 L. R. A. 508, 15 Am. St. Rep. 672, the Pennsylvania court said that "the departure made by the United States courts is to be regretted and certainly not to be followed." (Page 230.)

The argument advanced by defendant furnishes a number of very substantial reasons for supporting the efforts being made by prominent members of the English and American bars to secure the adoption by foreign countries and in the several states of the Union of a universal bill of lading, and for uniform legislation defining the rights and obligations of the parties to

such instruments; but it comes far from convincing us that it is our duty to change a rule of law affecting so widely the commercial interests of the state, adopted thirty years ago, founded upon mature and careful reasoning, with which we are entirely satisfied and which has been followed and approved by many courts of last resort. It follows that the demurrer to the petition was not well taken.

It only remains to consider the ruling sustaining the demurrer to the ninth and tenth defenses of the answer. These defenses were pleaded together by appropriate words, and will be considered as one defense. Briefly, the defense is that the bills were issued in the state of Missouri, were Missouri transactions, and are to be governed solely by the laws of Missouri; that the bills of lading were issued by some clerk who was without any authority whatsoever to issue or deliver them, no wheat having been actually delivered to the company at that time or thereafter, and that the bills were issued in violation of the laws of the state of Missouri; that by sections 739 to 748, inclusive, of the Revised Statutes of Missouri of 1889, which are set out in the answer in full, it is provided in substance that no railroad company or common carrier shall issue any bill of lading for any merchandise or property unless the same shall have been actually delivered to the carrier for shipment; that all bills of lading are by the provisions of the same statute made negotiable by written indorsement thereon and delivery in the same manner as bills of exchange and promissory notes, and no written or printed conditions therein shall in any way limit the negotiability thereof or impair the rights and duties of the parties thereto; that the aforesaid statute provides a penalty not exceeding $5000 or imprisonment in the penitentiary of the state not exceeding five years, or both, for the violation of its provisions, and further provides that any person or persons aggrieved by the violation of any of the provisions of the act may have

49—78 KAN.

and maintain an action at law against the person or corporation violating any provision of the statute to recover all damages, immediate or consequent, which he may have sustained by reason of such violation.

The answer then alleged that the statutes were, and ever since their passage had been, in full force and effect in the state of Missouri, and define the rights and duties of the parties to this action at the time the bills were issued; that the statute aforesaid has been construed by the highest court of the state to render bills of lading issued as the ones in question absolutely void, and that such bills convey no title to the property mentioned therein, nor do the recitations contained therein estop the railway company from denying the truth thereof, and that an assignee can not recover by virtue thereof, either by way of estoppel or in any other way, against the railway company whose agent issued the same.

The answer pleaded the three-year statute of limitations of Missouri on an action for a statutory penalty or forfeiture (Rev. Stat. of Mo. 1889, §§ 6773, 6776), and our own statute of limitations (Civ. Code, § 22) providing that no action shall be maintained in this state upon a cause of action which has arisen in another state between non-residents of this state when the same is barred by the laws of the other state.

In actions against a common carrier based upon contract, where no question is raised with respect to the right of the carrier to limit its common-law liability, the rule seems to be well settled that whatever obligation arises out of the contract is created by the law of the place where the acts are to be performed out of which the obligation sought to be enforced arises. (1 Hutch. Car., 3d ed., §§ 200, 201. To the same effect see *C. M. Ins. Co. et al. v. Force et al.*, 142 N. Y. 90, 36 N. E. 874, 40 Am. St. Rep. 576; *First Nat. Bank of Toledo v. Shaw et al.*, 61 N. Y. 283; *W., St. L. & P. Ry. Co. v. Jaggerman et al.*, 115 Ill. 407, 4 N. E. 641;

*Palmer v. Atchison, etc. R. R. Co.,* 101 Cal. 187, 35 Pac. 630.) In *First Nat. Bank of Toledo v. Shaw et al.,* 61 N. Y. 283, the bills of lading were issued upon grain purchased at Toledo, Ohio, and shipped to consignees in New York. The bills were assigned to the bank to secure advances to pay for the purchase. A question arose with respect to the meaning of certain notations written on the face of the bills. Evidence was offered of their commercial meaning at Toledo. The objection was made that the bills of lading were New York, and not Ohio, contracts. The court said:

"The general principle is that the law of the place where the contract is made is to govern, unless it is positively to be performed elsewhere. The fact that acts are to be done abroad under a contract does not necessarily make it a contract to be performed there, in a legal sense." (Page 294.)

The objection was not sustained, and the contract was held to be governed by the law of Ohio, "even though the goods were to be sent to another state, and ultimately sold there if the advances were not repaid." (Page 294. To the same effect are *W., St. L. & P. Ry. Co. v. Jaggerman et al.,* 115 Ill. 407, 4 N. E. 641; *Palmer v. Atchison, etc. R. R. Co.,* 101 Cal. 187, 35 Pac. 630.) In *C. M. Ins. Co. et al. v. Force et al.,* 142 N. Y. 90, 36 N. E. 874, 40 Am. St. Rep. 576, it was said that the obligation of the shippers of the cargo were to be determined by the law of the place where the contract was made, not by the "law of the flag." (Page 100.) Referring to actions on bills of lading, it was said in *Dike v. Erie Railway,* 45 N. Y. 113, 6 Am. Rep. 43:

"Whether the actions are regarded as actions of assumpsit upon the contracts, or as actions upon the case for negligence, the rights and liabilities of the parties must be judged by the same standard. The form of the action concerns the remedy, but does not affect the legal obligations of the parties. In either form of action the liability of the defendant, and the rights of the plaintiffs, are based upon the contracts. The defendant owed no duty to the plaintiffs except in virtue of the

contracts, and the obligations for the violation and breach of which an action may be brought are only coextensive with the contracts made." (Page 118.)

(See *A. T. & S. F. Rld. Co. v. Moore*, 29 Kan. 632, where the action was for negligence and based upon the common law of Texas.)

If the law of Missouri is as the answer alleged it to be, then the demurrer was improperly sustained, for the facts pleaded constitute a sufficient defense to the action, and the demurrer admits the truth of every fact alleged. But the contention is made that while the answer sufficiently pleaded the statute of Missouri the defendant, in attempting to aver as a fact the construction given to the statute by the courts of that state, has tied itself squarely to one, and but one, question of fact, which is that in a certain decision of the supreme court of Missouri, giving the title, volume and page of the report, such and such construction was placed upon the statute; so that the further contention is made that inasmuch as this one question of fact is, in its last analysis, a question of law, it is the duty of this court to examine the particular decision referred to and determine whether it is a fact that the court so held; and we are assured that an examination of the particular decision will demonstrate that it contains no reference directly or indirectly to the aforesaid statute. It may be observed that the answer also alleged a certain decision by the Missouri court of appeals to the same effect, but this can not aid the other averments of the answer, inasmuch as we are not bound by any construction placed upon the statute by that court, for the reason that it is a court of limited jurisdiction. (*Sykes v. Bank, ante,* p. 688.) The argument concedes the main point, however, which is that the answer does plead as a fact that the statute has been so construed by the highest court of that state as to prevent the plaintiffs from maintaining this action, if the same construction is to be given by the courts of this state. Whether

the averment of the answer is true, or how far its restricted language may limit the defendant's proof, are matters with which we need not at this time concern ourselves. It is only as questions of fact that the laws of another state can affect the rights of parties in an action in this state, and, when pleaded, they are alleged as facts. In the absence of an express statute authorizing us to do so we can not take judicial notice of the laws of another state, except for the purpose of aiding us in ascertaining and interpreting our own law upon the particular subject. (*Hunter's Adm'r v. Ferguson's Adm'r,* 13 Kan. 462; *Heim v. Gimber,* 67 Kan. 834, 72 Pac. 859.) In this case the circumstance that the pleader, who relies upon a particular decision of the supreme court of Missouri, has referred to the same by volume and page of the reports does not alter the situation nor change the rule. The law on this point is well settled. (See note to *Cherry v. Sprague,* 187 Mass. 113, in 67 L. R. A. 33.)

The judgment is therefore reversed and the cause remanded, with directions to overrule the demurrer.

BENSON, J., not sitting, having been counsel in the court below.