**CHICAGO, R. I. & P. R. CO. et al. v. CLEVELAND et al.**

No. 7653—Opinion Filed Oct. 3, 1916.

(160 Pac. 328.)

**1. Appeal and Error—Parties—Who are Parties.**

Where one only of two defendants ·in a joint judgment files a motion for a new trial, but both join as plaintiffs in error in an appeal therefrom and the case-made for appeal and the notice for settling and signing same is served upon the defendant, who filed no motion for new trial, and such defendant in due time waived the issuance of summons in error and entered his voluntary appearance in this court, held, that such party is in this court, and the party who filed the motion for new trial and properly preserved the record is a proper plaintiff in error, and entitled to have his appeal reviewed.

**2. Appeal and Error — Proceedings for Transfer of Cause—Waiver.**

A defendant in error or his attorney may waive in writing the issuance and service of a summons in error, and such waiver may be made at any time, prior to the expiration of the time allowed for appeal.

**3. Carriers—Carriage of Goods—Duty of Carrier—"Bill of Lading."**

A "bill of lading" is an instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it; and it is the duty of a carrier or its agent, issuing a bill of lading, for those products for which it is the general custom for shippers to draw drafts upon the consignee or others with bill of lading attached, to use ordinary care in issuing such bill of lading, in reference to the quantity and description of the product for which such bill of lading is issued.

**4. Words and Phrases—"Bale of Cotton."**

A "bale of cotton," as the term is used in the commercial and business world, means a standard package of merchantable lint cotton, separated from the seed by the first process of a cotton gin, weighing approximately 500 pounds, and classable under one of the recognized market grades.

**5. Same—"Grabbots."**

"Grabbots" or oilmeal motes, are composed of small particles of refuse cotton, detached from, but left with, the seed in the first ginning process and generally separated and recovered by a process of reginning.

**6. Carriers—Carriage of Goods—Bills of Lading.**

A bill of lading, issued by a carrier upon the receipt of 61 bales of "grabbots," describing the same as 61 bales of cotton, without any qualifying or modifying term, is not a correct description of the freight; and, where an innocent person has paid money relying on the representations contained in such bill, and sustains damages thereby, he may recover from such carrier the moneys so paid.

(Syllabus by Edwards, C.)

Error from District Court, Oklahoma County; Tom D. McKeown, Assigned Judge.

Action by A. S. Cleveland and others against the Chicago, Rock Island & Pacific Railway Company and another. Judgment for plaintiffs, and defendants bring error. Affirmed.

R. J. Roberts, C. O. Blake, W. H. Moore, K. W. Shartel, and Blake & Boys, for plaintiffs in error.

E. L. Fulton, for defendants in error.

Opinion by EDWARDS, C. For convenience, the parties will be referred to as plaintiffs and defendants, according to their position in the lower court.

The plaintiffs commenced this action against the defendant the Chicago, Rock Island & Pacific Railway Company and V. P. Barrett, by filing their petition, and later their amended petition, in which, after formal and jurisdictional allegations, it is alleged, in substance: That on April 21, 1911, the defendant railway company, by A. B.

Harding, its authorized agent, at Hobart, Okla.. issued and delivered to defendant, V. P. Barrett, its bill of lading No. D-133, for 61 bales of cotton, marked "V. P. B.," weighing 30,500 pounds, a copy of said bill of lading being attached. That the signature of the said Harding was certified by said railway company, a copy of such certificate being also attached. That said bill of lading was wholly false, fraudulent, and untrue, and known by the said Harding and the said Barrett at the time same were issued to be false, fraudulent, and untrue. That the said Harding at the time knew that the defendant company had not received 61 bales of cotton, but knew that there had been delivered to said company 61 bales of grabbots or oilmill motes, and knew that said grabbots or oilmill motes were not cotton. That said bill of lading was fraudulently, wrongfully, carelessly, and negligently issued by said Harding. Then follows the allegation, that the said bill of lading was indorsed by the said Barrett, and a draft for $3,965, drawn on plaintiffs at Houston, Tex., with said bill of lading attached, which was sent through banking channels in the ordinary course of business and presented and paid by plaintiffs before the arrival of said cotton at Houston, Tex., its place of destination. That said draft was drawn and paid pursuant to a general custom in the states of Texas and Oklahoma. That said 61 bales of grabbots or oilmill motes were delivered by the defendant company to plaintiff under said bill of lading and received by plaintiff for the reason that the same were delivered as comprising the shipment under said bill of lading, and that plaintiffs desired to protect themselves as far as possible by reason of the payment of said draft. That said grabbots or oilmill motes were stored in a warehouse, which warehouse and said contents were later destroyed by fire, and the said grabbots or oilmill motes were settled for by the insurance company at three cents per pound, aggregating $1,022.28, an amount in excess of their actual value. Plaintiff further alleges that the said 61 bales of grabbots or oilmill motes did not come within the description nor constitute the cotton described in the bill of lading in that grabbots or oilmill motes were not cotton nor the product of any cotton gin. Judgment is prayed for the amount of the difference between the draft paid and the sum received from the insurance company. The defendant, V. P. Barrett, filed no answer. The defendant railway company filed an unverified general denial, with an admission of corporate capacity. Judgment was rendered by default against the defendant Barrett, and the action as to the defendant railway company tried to a jury, and a verdict rendered for the amount prayed for, upon which

verdict judgment was entered. A motion for new trial was filed by the railway company, which was overruled and exceptions saved, and, within extensions of time allowed, an appeal was filed in this court, with both the defendant Barrett and the defendant railway company plaintiffs in error, and the plaintiffs below as defendants in error.

At the outset a motion to dismiss the appeal is urged, for the reason that, as the appeal is by case-made and no motion for new trial was made by the defendant Barrett, he is not properly in this court as a plaintiff in error, and the record, not being certified as such, cannot be treated as a transcript, and for the further reason that the waiver of issuance of summons in error and the entry of voluntary appearance was made prior to the filing of case-made and petition in error in this court. The record discloses that the defendant V. P. Barrett appears as a plaintiff in error; that the case-made was served upon him; that he waived the suggestion of amendments thereto, and waived notice of time and place of presenting the case-made to the trial judge for settling and signing, also waived the issuance and service of summons in error, and in the same instrument entered a voluntary appearance, in these words:

"I, V. P. Barrett, the undersigned defendant in the above-entitled cause, hereby waive the issuance and service of summons in error out of the Supreme Court of the state of Oklahoma in the above-entitled cause, and hereby voluntarily enter my appearance in said court in said cause."

These seem to be unusual steps for a plaintiff in error to pursue in taking an appeal to this court. Just why a plaintiff in error should deem it necessary to serve his case-made upon himself and make the waivers mentioned we are at a loss to comprehend, unless it is to meet just such a condition as is here presented.

While two separate verdicts were rendered in this action, one against each of the defendants, the one against the defendant Barrett by direction of the court, and by default, the one against the defendant railway company after a trial, yet the judgment entered upon these verdicts is a joint judgment against the defendants, and it is well-settled by this court that all persons against whom a joint judgment has been rendered must be made parties to a proceeding to reverse such judgment. A failure to join any of them is ground for the dismissal of the appeal. The authorities, however, do not require that the parties in the trial court shall be before this court in any particular capacity, but permits them to appear as plaintiff in error or defendant in error, and to be brought in by

summons or voluntary appearance. Outcalt v. Collier, 6 Okla. 615, 52 Pac. 739; Id., 8 Okla. 473, 58 Pac. 642; Wedd v. Gates, 15 Okla. 602, 82 Pac. 808; Strange et'al. v. Crimson, 22 Okla. 841, 98 Pac. 937; Weisbender et al. v. School, Dist. No. 6 of Caddo County, 24 Okla. 173, 103 Pac. 639; John v. Paullin et al., 24 Okla. 636, 104 Pac. 365; First National Bank v. Jacobs, 26 Okla. 840, 111 Pac. 303; Vaught v. Miners' Bank of Joplin, 27 Okla. 100, 111 Pac. 214; Burns v. Toney, 27 Okla. 728, 117 Pac. 209; Trugeon et al. v. Gallamore, 28 Okla. 73, 117 Pac. 797; Gwinnup et al. v. Griffins et al., 34 Okla. 117, 124 Pac. 1091; Wiley v. Cobb, 38 Okla. 71, 131 Pac. 1098; Southwestern S. & I. Co. v. Hall, 40 Okla. 447, 139 Pac. 305. So, then, if the defendant below, V. P. Barrett, is in this court by voluntary appearance, it is immaterial whether he be styled a plaintiff or a defendant in error. All jurisdictional requirements having been met, the plaintiff in error, railway company, would have a right to have its appeal reviewed in this court, although V. P. Barrett. on account of his failure to file a motion for new trial, would not have such right. Having reached this conclusion, it is immaterial that the case-made is not certified as a transcript.

It is further urged, as a ground for dismissal, that the signing of the waiver of summons in error before the settling and signing of the case-made by the trial judge is insufficient to give this court jurisdiction. This is an entirely new question, and the only authority cited by either party is the case of Taylor v. Riggs (Kan. App.) 52 Pac. 910, in which it is held that the waiver of summons in error after the case-made has been settled and signed is sufficient, the court in that case saying:

"There is no statute authorizing a person to waive the issuance and service of summons prior to the commencement of an action in the district court. The taking of a case from the trial court to the Court of Appeals is not the commencement of an action, but is an appeal, and controlled by other statutory provisions. In proceedings for the review of a judgment of a trial court, the defendant in error or his attorney may waive in writing the issuance and service of a summons in error. * * * We see no reason why such waiver may not be made at any time after the case-made has been settled and certified by the trial judge."

That case is, we think, in point, the only difference being in that case the waiver was signed after settling and signing, while in the case at bar the waiver was signed prior to the settling and signing of the case-made. The mere settling and signing of the case-made does not make the waiver effective—

the case might be settled and signed and never filed; such waiver can have no effect until the appeal is filed in this court. The mere fact that the waiver was executed prior to the filing of the appeal, or prior to the settling and signing of the case-made. would not, we think, affect the appeal. The practice among the attorneys of this state of waiving in writing summons in error prior to the settling and signing of the case-made is, and for many years, has been, very general, and we see no good reason for withholding judicial sanction of such practice. The law apprises the counsel for a successful litigant and his client of the right of the adverse party to appeal, and if such successful litigant, even before the case-made is settled and signed, elects to waive the issuance and service of summons in error, he will not be heard to question the sufficiency of the appeal on that ground. When the case-made is filed in the appellate court, the waiver becomes effective. The motion to dismiss is therefore overruled.

Our statute (Rev. Laws 1910) defining bills of lading and touching their negotiability, is as follows:

"828. A bill of lading is an instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it; stating the name of the consignor and the terms of the contract for carriage, which may include reasonable requirements as to notice and demand of damages; and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place.

"829. All the title to the freight which the first holder of a bill of lading had when he received it passes to every subsequent indorsee thereof, in good faith and for value, in the ordinary course of business, with like effect and in like manner as in the case of a bill of exchange.

"830. When a bill of lading is made to bearer, or in equivalent terms. a simple transfer thereof by delivery conveys the same title as an indorsement."

A bill of lading is a receipt as to the quantity and description of the goods shipped and a contract to transport and deliver the goods to the consignee or order (Delaware v. Oregon Iron Co., 14 Wall. 579, 20 L. Ed. 779). and we construe the petition in this case to state a cause of action for negligence and want of ordinary care on the part of the agent of the defendant railway company in issuing the bill of lading complained of. Though the petition contains allegations tending toward the theory that the action is one for fraud, yet considered as a whole, the action is based on the negligence and want of ordinary care of defendant's agent. As was said in the case

of Missouri, K. & T. R. Co. v. Sealy et al., 78 Kan. 758, 99 Pac. 230:

"In the petition in this case there are averments * * * sufficient to set up a cause of action for a breach of contract; and there are averments that the bills were issued fraudulently, and that by reason thereof the plaintiffs have suffered damage, but these latter may be regarded as merely statements averring a breach of the contract, for it sufficiently appears that the action is solely to recover the amount advanced upon the faith of the statements contained in the contracts. The doctrine is well settled that where a petition contains a good cause of action for a breach of contract the addition of words or averments which are appropriate to a cause of action for a wrong will not change the action from contract to tort."

The question for our determination then is, Were the 61 bales of grabbots properly described in the bill of lading, or, if not, did the agent for the railway company use ordinary care in describing in the bill of lading the said produce received for shipment? "A bale of cotton," as the term is used commercially, means a package of merchantable lint cotton, separated from the seed by and the first produce of a cotton gin, weighing approximately 500 pounds and classable under one of the recognized grades of cotton. Cotton might be baled before being ginned, and in such state might, in a popular sense, be called a bale of cotton, but it could not be so classified in a commercial sense. The same is true of "linters" and of "grabbots." Grabbots, or oilmill motes, are composed of the small particles of refuse cotton, detached from, but left with, the seed in the first process of ginning and generally recovered from the seed by a process of reginning. In a generic sense grabbots are cotton, but not in that sense in which the term "cotton" is used in the commercial and business world. The statute, section 828, supra, requires the bill of lading to describe the freight so as to identify it, yet no one in the cotton business would identify 61 bales of grabbots under a bill of lading describing 61 bales of cotton. It follows that the bill of lading does not properly describe the freight shipped. The case was tried upon the theory that it was the duty of the agent of the railway company to use ordinary care in issuing bill of lading. The court instructed the jury:

"* * * It is also the duty of such agent, where a general custom prevails that shippers of a certain kind of products, after having secured a bill of lading to draw a draft with such bill of lading attached, and that such drafts would be paid by the person upon whom the same were drawn before the product or the goods for which the bill of lading was issued is delivered to the person paying the draft, to use ordinary care in issuing the bill of lading in reference to the description or quantity of goods for which the bill of lading was issued."

Ordinary care and negligence are defined in the instructions. Was there a want of ordinary care on the part of Harding, the agent for the railway company, in issuing the bill of lading in question, and in describing the freight as "cotton," without any qualifying or modifying term such as would apprise any person on whom a draft might be drawn with this bill of lading attached, that the produce therein described was not the ordinary merchantable bale of cotton contemplated by the business world in the use of such term? The record discloses that previous to the time the bill of lading in question was issued, the Hobart Cotton Oil Company, of Hobart, Okla., sold to one R. M. Simmons the 61 bales of "grabbots" involved in the action, and that prior to the issuance of said bill of lading Simmons sold said grabbots to the defendant Barrett, and before the bill of lading was issued the manager of the said Cotton Oil Company called the agent of the defendant railway company, who issued the bill of lading by phone, and advised him that said Barrett was on his way to the depot to have bill of lading issued, and notified the said agent that the product to be billed was grabbots. On the arrival of Barrett at the depot the said agent made further inquiry, and was informed by Barrett that the product was grabbots, but that grabbots were cotton and not linters. The tariff in force at that time contained two classes for baled lint from cotton, designated as "cotton" and "linters." The "cotton" designation and rate was deemed by the agent of the railway company to be the proper one, and he thereupon issued the bill of lading for "sixty-one bales of cotton—V. P. B.—not compressed," consigned to order of V. P. Barrett, Houston, Tex.

The custom of drawing drafts on cotton bills of lading was shown; it was known to the agent of defendant. In every town and village throughout the cotton producing section the producer sells his cotton to the local merchant or buyer. In a great many instances the local buyer ships the cotton, takes a bill of lading, and draws a draft on the consignee, with the bill of lading attached. The draft is paid in regular course of business, upon the faith of the bill of lading; and ordinary care, at least, should be exercised in issuing such bills so that innocent parties, dealing on the strength of the representations made therein, may not be misled. See Wichita Savings Bank v. A., T. & S. F. R. Co., 20 Kan. 519. In the case of Wichita Falls Compress Co. v. W. L.

Moody & Co. (Tex. Civ. App.) 154 S. W. 1032, the carrier was held liable upon a bill of lading in which half bales, weighing an average of about 250 pounds, were described in the bill as bales, the court saying:

"It was shown that the term 'bale of cotton' has a definite meaning in the cotton business; that it means a merchantable bale weighing approximately 500 pounds. * * * It was also shown that the general custom and practice as to handling the cotton business, financing the crop, and moving it to market was for the owner to deliver his cotton to the carrier and secure shipper's order bill of lading therefor, and make draft on purchaser at destination: that banks and others will generally advance to the shipper the cash called for in the draft, and thus such draft, with bill of lading attached, will make its way through the exchange centers to destination. Instead of delivering 485 bales of cotton called for by this bill of lading, 485 half bales were delivered. It was the necessary expectation of this appellant, in issuing such bill of lading, that a business transaction would be consummated upon the faith of same with W. L. Moody & Co., said firm being mentioned therein, and that said transaction would probably include advances made upon the faith of such bill of lading. * * * We are of the opinion that, under the facts in this case, this applicant is estopped to deny that it received the 485 'bales of cotton' as said term was used and understood among those dealing in and handling cotton, viz. of the approximate weight of 500 pounds."

In the case at bar the agent for the defendant railway company had special warning and notice that the produce to be shipped was not the ordinary merchantable cotton, but was grabbots, but, notwithstanding such notice, the agent issued the bill for the product as cotton without any qualifying or modifying term or description which would, in any manner, give notice to any person who might deal on the representations contained in the bill. This we think was a failure to exercise ordinary care, and negligence for which the railway company is liable.

The judgment is affirmed.

By the Court. It is so ordered.