Gigoux v. Moore.

---

No. 22,056.

J. F. GIGOUX, *Appellee*, v. W. D. MOORE and G. L. MOORE, *Appellants*.

### SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Procured by Fraud—Collateral Security by One Corporation for Debt of Another—Notice of Infirmity—"Holder in Due Course."* The plaintiff was the holder of the note of a realty company which was secured by deposit of collateral consisting of notes to the amount of $15,000, and of the value of $15,000. A railroad company then secured the note of the realty company by deposit of collateral consisting of notes of the face value of $6,500, which were exchanged and substituted for the other collateral notes. Among the notes deposited by the railroad company was one given the railroad company by the defendant. It was complete and regular on its face, and was not dishonored or overdue, but it had been procured by fraud, and was negotiated in violation of a restricted agreement. *Held:* (*a*) The plaintiff gave value for the defendant's note; (*b*) the defendant was not at liberty to assert that deposit of collateral security by the railroad company for the debt of the realty company was void because *ultra vires;* (*c*) the fact that one corporation was securing the debt of another did not charge the plaintiff with notice of infirmity in the instrument or defect in the railroad company's title; (*d*) such fact did not render acceptance of the instrument by the plaintiff an act of bad faith, or otherwise deprive him of the character of a holder in due course.

2. SAME—*"Bad Faith" as Used in Statute Interpreted.* The bad faith which is referred to in section 63 of the negotiable-instruments law, and which is the antithesis of the good faith referred to in section 59, is bad faith in fact, derived by inference of fact, as distinguished from inference of law, and the substantial equivalent of fraud.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed October 11, 1919. Affirmed.

*Kos Harris, V. Harris,* both of Wichita, and *W. W. Schwinn,* of Wellington, for the appellants.

*Paul Brown, Silas S. Brown,* both of Wichita, *Horace W. Danforth,* and *William P. Kavanagh,* both of Denver, Colo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by the indorsee of a promissory note, to recover from the maker. The defense was that the note was procured by fraud, that negotiation to the plaintiff was in violation of an agreement, and that the plaintiff was not a holder in due course. The verdict and judgment were for the plaintiff, and the defendant appeals.

The Denver, Laramie & Northwestern Railroad Company was a corporation organized for the purposes indicated by its name. Three subsidiary corporations were organized for purposes related to the railroad project. They were the Denver & Laramie Realty Company, the Northwestern Land & Iron Company, and the Colorado & Wyoming Coal Company. The four companies had some directors in common, and had offices with a common lobby on the same floor of a building in Denver, Colo. C. S. Johnson was president of the railroad company, was a director of the realty company and the iron company, and was "fiscal agent" of all the companies.

The plaintiff lived at Greeley, Colo., and was freight agent of the railroad company at Greeley. He was a stockholder of the railroad company and of the realty company. He had a pass over the railroad, and frequently visited the Denver office. He took some part in the business of the railroad and allied companies, and on one occasion acted as a member of a committee to examine the. affairs of the railroad company and make a report intended for general circulation. He signed what was given him to sign, as a "kind of bill of health for the railroad," believing "everything was all right and in good shape, and the head officers were doing their best."

At the solicitation of Johnson, the plaintiff made advancements of money, by checks, to the realty company, amounting to $6,000, and a note for that amount was given the plaintiff by the realty company. Johnson said he wanted the money for the railroad company, but the plaintiff could have the note

of any company he desired. Johnson suggested the realty company, and because the plaintiff owned $5,000 of its stock, he took the note of the realty company. The plaintiff understood the money was going to the realty company on its books, and that it would go round and keep the books straight, and Johnson would get the money and use it for the railroad company. The note was secured by a deposit of notes amounting to $15,000, payable to the iron company, given by a man named Failing. Afterwards the plaintiff bought stock of the iron company to the amount of $2,000.

Representatives of the railroad company came to Wichita, Kan., on a money-raising campaign. By means of representations which were not refuted at the trial, and which need not illuminate these pages with their dazzle, the defendant and others were induced to give notes to the railroad company. Some of the representations were not actionable because they contradicted essential terms of the instruments, and some of the representations were not proved at the trial; but there was an agreement that the notes should not be negotiated except to a specified trust company, for a specified purpose. The defendant's note was for $1,000, and was dated September 8, 1911. In 1912 the defendant became a director of the railroad company.

On September 13, 1911, the defendant's note came into the hands of the plaintiff, under these circumstances: The Failing notes were good, and were about to be paid; in order to keep the money in his clutches, Johnson told the plaintiff the Failing notes were of no account, but he had some gilt-edged Kansas paper which he would turn over to secure the plaintiff's realty-company note, in place of the Failing notes; substitution of Kansas notes to the amount of $6,500, including the note sued on, was made for Failing's notes, which were afterward paid.

As a part of the defense that the plaintiff was not a holder in due course, the answer alleged that the defendant's note was delivered to the plaintiff without any consideration passing from the plaintiff to the railroad company. In another part of the answer the defendant described just what occurred. The defendant's note, and other Kansas notes, were exchanged and substituted for the Failing notes. The general allegation is controlled by the detailed statement of facts. Section 32 of

the negotiable-instruments law defines value as any consideration sufficient to support a simple contract (Gen. Stat. 1915, § 6552). Consideration is present in an exchange of one set of notes for another, to the same extent as if cash were paid, and a valuable consideration did pass, as a matter of law and of fact, from the plaintiff to the railroad company.

The obligation secured was that of the realty company. The security was furnished by the railroad company. Assuming that one corporation is not permitted to secure the debt of another, the plaintiff seems to regard the assumed fact as affecting, in some way, valuable consideration. Restriction of corporate power is one thing, and consideration is another. Whether or not the railroad company acted within its corporate power, the plaintiff gave it the Failing notes, actually worth $15,000, for Kansas notes of the face value of $6,500, which certainly constituted consideration.

The defendant's main contention is that since the railroad company was not indebted to the plaintiff on the note of the realty company, the railroad company lacked corporate power to secure the note of the realty company. From this premise three conclusions are drawn: First, the deposit of the defendant's note by the railroad company to secure the realty company's note was contrary to public policy, illegal, and void; second, the plaintiff had notice of the defect in the railroad company's title; third, the plaintiff did not acquire the paper in good faith. This theory was fully presented in the answer by proper allegations.

The first conclusion is one which the plaintiff has no standing to deduce, because the premise involves a matter between the corporation and the state, not open to collateral inquiry by private persons. (*Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123.)

The second conclusion is unsound. The negotiable-instruments law reads as follows:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to fraud.

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or

knowledge of such facts that his action in taking the instrument amounted to bad faith." (Gen. Stat. 1915, §§ 6582, 6583.)

The notice contemplated by the statute is of two kinds, actual knowledge and factual knowledge. Actual knowledge is knowledge of the very defect in title—in this instance, fraud on the maker in procuring and in negotiating the instrument. Factual knowledge is knowledge having a relation to the same subject—defect of title; and the bad faith referred to is bad faith in respect to that subject. The defendant set the paper afloat, and the plaintiff owed him no duty to inquire under what circumstances. There was nothing about the note to suggest that the railroad company did not hold it free from all defenses and free from all restrictions on negotiation. Knowledge on the part of the plaintiff that the railroad company was securing the debt of the realty company was not knowledge, either actual or factual, that the security itself was tainted, or that its negotiation was tainted. The two subjects bear no relation to each other, and suggestion of one has no tendency whatever to awaken the mind to the other. Conceding the railroad company was diverting its assets to uses not permitted by its charter, to the detriment of its stockholders, the question was: Did the plaintiff have notice of the fraud in procuring the paper, or notice of the restriction on its negotiation? The fact that the railroad company was securing a debt not its own bore no relevancy whatever to that question.

The third conclusion is likewise unsound. The negotiable-instruments law defines holder in due course as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." (Neg. Inst. Law, § 59, Gen. Stat. 1915, § 6579.)

In this instance the note was complete and regular on its face, the plaintiff became holder before it was overdue, it had not been previously dishonored, the plaintiff paid value, and he was without notice of infirmity in the instrument or defect in the title of the person negotiating it. The plaintiff possessed every qualification of a holder in due course, unless the fact

that the railroad company was securing the debt of another company deprived the transaction of the quality of good faith on his part. Leaving at one side the fact that the defendant is not privileged to usurp a prerogative which the state does not share with individuals, by questioning the propriety of the transaction, acceptance of security from one corporation for the debt of another does not, of itself, constitute bad faith.

The railroad company may have been acting under express charter authority, or it may have been exercising a power legitimately implied from the charter grant. One corporation may lawfully give security for the debt of another. Such an act may be on ample consideration, moving from the company whose debt is secured, or may be in direct and immediate furtherance of the interests and objects of the corporation supplying the security. It is a matter of common knowledge that unimpeachable transactions of that character are frequent in the course of present-day corporate business. The plaintiff rested under no duty to any one to investigate the circumstances and decide, at his peril, whether or not the railroad company was transgressing the limit of its power. He was protected in any event. If the railroad company were not permitted to secure the debt of the realty company, the state might administer proper correction to the railroad company; but the railroad company could not repudiate the transaction, and the debt would be secured as effectually as if the railroad company possessed requisite capacity. (*Harris v. Gas Co.,* supra.) Here, as in the case of notice of infirmity in the instrument or defect in title of the holder, bad faith is bad faith in fact, bad faith derived by influence of fact, as distinguished from inference of law. Here, as in case of notice of infirmity or defect in title, failure to use ordinary diligence in following up suggestive facts, or facts arousing suspicion, is not sufficient. (*Bank v. Reid,* 86 Kan. 245, 120 Pac. 339.) The expression found in the old law of bills and notes, "usual course of business," is not found in the section of the negotiable-instruments law quoted. Actual bad faith is essential. Unless, therefore, the security transaction were not, in truth, what it purported to be, and the plaintiff were intentionally colluding in misappropriation of the corporate assets, or were resorting to some deceitful practice or device, or were otherwise acting from repre-

hensible motives, to achieve some unconscientious or unjustifiable result, he was not guilty of bad faith. The naked fact that one corporation furnished security for the debt of another was not enough.

Admitting for the moment that a corporation exceeding its power by giving security for the debt of another might plead *ultra vires,* acceptance of the security does not, alone, spell fraud on the part of the taker. The transaction is merely irregular, in the sense that it is not according to general business custom. Because it is not according to the usual course of business, the taker of the security is put upon inquiry respecting the corporation's actual authority. If he accept the security without inquiry, the corporation may interpose its defense; but he is not chargeable with that moral delinquency which is essential to actual bad faith. When, as in this instance, the corporation does not complain, and the question of *ultra vires* is raised by a private person, disqualified to do so, it is quite obvious bad faith must be established by proof of something more than the fact that one corporation secures the debt of another.

Since there was neither pleading nor proof to the contrary, the presumption is the law of Colorado is the same as the law of Kansas. Sections of the negotiable-instruments law which have been quoted are, however, the same as the corresponding sections of the negotiable-instruments law of Colorado. It is the policy of the negotiable-instruments law to protect and to promote the free movement of negotiable paper in the channels of trade and commerce, and a holder is entitled to the privileges of a holder in due course, other requirements being fulfilled, unless in acquiring the paper, or unless in his attitude toward the maker who has defenses, he act in such bad faith that his conduct is substantially equivalent to fraud.

In discharging the burden of proving he was a holder in due course, fraud in procuring and negotiating the paper being tacitly recognized, the plaintiff produced evidence tending to show the four corporations which have been named were allied in interest in the railroad project, and were in the habit of borrowing from each other, and of exchanging assets and collateral for their common benefit. Such transactions were adjusted by a system of bookkeeping, and were ultimately cleared

on the books of the railroad company. The various boards of directors were fully cognizant of the practice, and made no objection, and after the practice had become established, steps were initiated to make the corporate records of the various companies formally correspond. The court instructed the jury, in the light of this evidence. Error is assigned in respect to the admission of portions of the evidence, in respect to instructions given, and in respect to the refusal of the court to instruct the jury according to the defendant's theory of the case, which has been considered at length. It is not necessary to examine the assignments of error in detail. The plaintiff was not obliged to extend his proof as he did, and that feature of the trial may be disregarded. There is no contention, and under evidence properly admitted and not disputed there could be no serious contention, that the plaintiff knew of the fraud in procuring and negotiating the note, or was otherwise guilty of bad faith. The facts upon which the defendant relied as establishing bad faith were not sufficient for the purpose.

It is not necessary to review the cases cited by the defendant. Those from other states discuss matters upon which this court has expressed itself. Those from this state are either distinguishable, or else not authoritative. In this instance the corporation was not one whose constitution was such that it could not, under any circumstances, give security for the debt of another. In giving the security, the officers of the corporation acted in its behalf in a corporate matter, and not for personal advantage in their own private business. The plaintiff gave value for the security he received, and the corporation is not complaining. Some expressions in some of the earlier cases must be regarded as modified by the decision in the case of *Harris v. Gas Co.*, supra. In none of the cases cited was the negotiable-instruments law involved.

The judgment of the district court is affirmed.