No. 23,567.

CLARK BURDG, doing business as CLARK BURDG GRAIN COMPANY, *Appellee*, v. V. C. SCOTT, doing business as V. C. SCOTT GRAIN COMPANY, *Appellee*, NATIONAL BANK OF COMMERCE OF WICHITA, Intervenor, *Appellant*.

### SYLLABUS BY THE COURT.

1. SHIPMENT OF WHEAT—*Bill of Lading Indorsed to Bank—When Title to Wheat Passes.* One who purchases certain cars of wheat on the railroad track, procures shipper's-order bills of lading to himself as consignor and consignee and draws drafts on certain grain companies for the price of the wheat and indorses such bills of lading and attaches them to the drafts and deposits the same in the bank and receives credit therefor subject to check, thereby passes the title of the wheat to the bank.

2. BILL OF LADING—*Indorsement—Bona Fide Holder—Bad Faith.* In order to preclude a bank in the situation indicated by the foregoing paragraph from being a *bona fide* holder of such bills of lading and drafts attached, it must, in the transaction by which it received such paper, have acted in bad faith.

3. SAME. The fact that such indorser of the bills of lading with the drafts attached was a regular customer of such bank and had been frequently overdrawn for some time and that the bank knew or had reason to believe that he was insolvent, would not make the bank guilty of bad faith in accepting such paper.

4. SAME—*Instructions—Findings of Jury.* Although the findings of the jury were to the effect that the paper referred to was received by the bank for collection and not placed to the credit of the indorser, still the refusal of the court to give properly requested instructions touching the good faith of the bank in receiving such paper was error, and the erroneous instruction given must be deemed to have had the effect of coloring the verdict of the jury, and therefore prevented the bank from having a fair trial.

5. SAME—*Evidence.* Certain conversations between the parties subsequent to the transaction touching the receipt by the bank of the paper already referred to, held competent.

Appeal from Sedgwick district court, division No. 2; WILLIAM KEITH, judge *pro tem.* Opinion filed June 10, 1922. Reversed.

R. R. *Vermilion, Earle W. Evans, Joseph G. Carey,* and *W. F. Lilleston,* all of Wichita, for the appellant.

*John W. Adams, William J. Wertz,* both of Wichita, for the appellees.

The opinion of the court was delivered by

WEST, J.: This appeal involves the ownership of two cars of wheat. Clark Burdg and V. C. Scott were grain dealers with offices in the same building in Wichita. The former sold to the latter two cars of wheat, then on the tracks at Wichita, indorsed the bills of lading to him and received two checks on the National Bank of Commerce where both did business. These checks were taken to the bank about 2:30 of the afternoon of February 13, 1920, and deposited to the credit of Burdg and entered upon his pass book. Scott went to the railroad companies which held the wheat and surrendered the bills of lading, took out new shipper's-order bills of lading to himself as consignor and consignee. The shipper's orders contained the notation: "notify Barrett Grain Company, Kansas City, Missouri," and "notify Armour Grain Company." He then drew on S. H. Miller Grain Company for $3,980.01, indorsed the bill of lading obtained from the railroad companies and attached the same to the draft. He also drew a draft on Barrett Grain Company of Kansas City for $3,500 and indorsed the other bill of lading and attached it to the draft and presented these drafts and bills of lading to the receiving teller of the bank about 3 p. m. of the same day, February 13, and received credit for such drafts on his account, such credits being entered upon his pass book subject to check. When the plaintiff's checks were presented, the receiving teller stamped them "Paid" and gave the plaintiff credit in his pass book.

When the accounts were balanced later in the day, the defendant Scott did not have sufficient funds to his credit to pay the two checks he had given the plaintiff. The bank, therefore, charged the checks back to the plaintiff and notified him that they were not good. The plaintiff came to the bank the same afternoon when the two checks to him by defendant Scott were delivered to and received by the plaintiff. He demanded the two bills of lading which had been surrendered by Scott to the railroad companies. In the meantime the bank had called Scott and a note had been drawn up for the balance due the bank and a chattel mortgage signed by

Scott, which was afterwards in his presence torn up, and the plaintiff took a chattel mortgage from Scott for the amount due. him for the wheat.

The next day the plaintiff sued the defendant Scott to recover $7,415, the purchase price of the wheat then in possession of the railroad companies. Three days later the defendant bank was permitted to intervene and set up its claim to the wheat and execute a forthcoming bond and obtain possession of the wheat. On November 9, 1920, the bank filed its amended petition of intervention. On April 6, 1921, after a trial before a judge *pro tem.* and a jury, a verdict was returned in favor of the plaintiff against the bank on which judgment was entered and from which judgment this appeal is taken by the bank.

Errors are assigned upon certain rulings on evidence, the denial of the bank's motion for a directed verdict, the submission of special questions to the jury, the giving and refusing of instructions and the denial of a new trial.

The plaintiff in his petition against the defendant Scott alleged that the latter gave checks which were not paid for lack of funds and fraudulently contracted the debt, and asked judgment for the purchase price of the wheat.

By its amended intervening petition the bank alleged, among other things, that after the bills of lading had been indorsed to Scott, the latter drew his drafts upon the Barrett Grain Company for $3,500 and on the S. H. Miller Grain Company for $3,980 and attached them to the indorsed bills of lading, which drafts were cashed by the defendant bank, and that after the suit and attachment had been begun and levied by the plaintiff, the wheat was the property of the bank and was in transit in interstate commerce in possession of the director-general of railroads as a common carrier, to be shipped to Kansas City, Mo. It prayed that the bank be given possession and adjudged the owner of the wheat.

The plaintiff denied that the title ever passed from Scott to the bank, and alleged that if the bank received the bills of lading from Scott it knew that they were for the wheat belonging to the plaintiff for which he had not been paid except by the checks of Scott, and knew that Scott's account was overdrawn at the bank and that he was insolvent, and with such knowledge the president of the bank stated to the plaintiff that the bills of lading would be held for collection and that after forwarding them for collection the defendant stopped payment thereon and they were never paid.

It will be seen that the litigation centered around the question of ownership of the wheat. Mr. Scott testified that he consigned the orders to himself because it was customary and he considered that he owned the wheat until it reached Kansas City; that the two drafts were delivered by him to the bank to be collected from the firms upon which they were drawn, as customary; that it was his custom and expectation that as soon as they were deposited with the bills of lading attached he would be given credit and could check upon the amount.

The receiving teller of the bank testified that when a deposit slip like the one made to Mr. Scott is presented, the amount is entered in the bank book and is then subject to check by the customer; that if it were not subject to check a receipt would be given and credit would not be given until the money was returned. He testified that the charge of $3.70 was the rate of interest for the advancement of the money paid to the bank and deducted from the account; that this charge is sometimes termed exchange: "It is exchange or interest on the advancement. It is our collection fee for that."

"If we had not made that charge then Mr. Scott would have gotten the use of this money on the 13th day of February and the bank would not have gotten the money back from the proceeds of the collection of the draft until some days thereafter. And this charge of $3.70 is to compensate the bank for the use of that money during that interval. . . .

"When a customer ordinarily doing business with the bank, as Mr. Scott has been, presents a draft with a bill of lading we credit him on his book. If the draft isn't paid we charge it off."

Mr. Carey, president of the bank, testified among other things that Scott and Burdg were both doing business with his bank and engaged in the grain business; that the drafts and bills of lading after being deposited in the bank were forwarded in the regular course of business for payment at destination.

"When those drafts and bills of lading were delivered to the bank the amount was placed to the credit of V. C. Scott Grain Company and was subject to check, and then the drafts were sent forward by the bank for the collection of the money with the bills of lading on them. I heard the testimony of Mr. Worrell about the charge of $3.70 on this deposit. That is a charge made for placing the proceeds of the draft immediately to the credit of the drawer of the drafts for his use. That represents a charge for the use of the money from the time it is placed to his credit to the time it is collected and placed to our credit in Kansas City. If that draft had been simply taken for collection for Mr. Scott without giving him credit for it there would have been no charge of that kind."

He further testified that he saw Mr. Burdg and Mr. Dixon on the evening of the 13th and when Mr. Burdg demanded back the bills of lading he replied that they had been forwarded in the regular course of business to Kansas City; that he did not use the term "for collection," but probably said they were forwarded for payment.

The man in charge of the bookkeeping department of the bank testified that at the close of the day's business, February 13, there was a balance of $2,514.48 to the credit of the Scott Grain Company; that the books really showed two deposits on that day, one after some checks had been returned. The other deposit was for $7,476.30 and there were four checks charged off at the close of the business, leaving to his credit a balance of $2,514.48.

There was considerable testimony introduced showing that Scott's account had been overdrawn frequently for some time. Mr. Scott testified, among other things, that in his conversation with Mr. Carey in the afternoon of the 13th it was decided that about all he could do was to give a note and chattel mortgage for the overdraft and he afterwards saw Mr. Carey with reference to paying Burdg his money; that Mr. Carey tore up the chattel mortgage and note he had signed, and he, Scott, gave Burdg a chattel mortgage.

Mr. Dixon testified that when Burdg got to the bank Mr. Carey told him there were two checks that were no good and Burdg inquired where the bills of lading were and was told they had been sent to Kansas City for collection, and said:

"'That is our wheat. He just the same as stole it from us. If these checks are no good, I want the wheat and I want the ladings.' He says, 'We hold the ladings and they have gone on for collection.'"

Mr. Scott was then brought back to the bank and advised that his two checks were not good. Mr. Carey said: "'We have sent these on for collection and . . . when they get up there, this will show a balance to Mr. Scott's credit,'" and then he said: "'You give a check to Clark Burdg Grain Company for $2,463 and we will make a deposit slip out and if those drafts are paid to-morrow we will then cash your check but not unless those drafts are paid as they were taken for collection,'" and Burdg went out and telegraphed to stop payment on those drafts in Kansas City.

Mr. Burdg testified that he learned the next day that Scott was insolvent and then called the firms on the telephone and advised

Burdg v. Scott.

them not to honor the drafts. He then instituted attachment proceedings.

The jury returned a verdict in favor of plaintiff Burdg and answered twelve special questions, finding that Scott did not deliver the bills of lading to the bank for credit on his account; that they were not received by the bank and placed to the credit of Scott, and that they were not indorsed to the bank by him for credit subject to check, and were not placed to his credit subject to check; that the bank, when the two checks given to the plaintiff were presented, stamped them "Paid" and gave the plaintiff credit in his pass book; that when Scott delivered the drafts and bills of lading to the bank he intended to deliver them for collection only; that the bank charged a collection fee of $3.70; that it was the understanding that if the drafts were not paid this would be paid back to the account of Scott; that Scott had overdrawn in the bank when he gave the two checks to Burdg; that on the evening of the 13th the plaintiff was informed by the bank that the credit given him for his two checks would be canceled and that the bank through its agent stated to the plaintiff that they had sent the drafts for collection.

Counsel for the bank contend that the testimony shows without serious dispute the drafts and bills of lading were taken from Scott and placed to his credit, and hence, it was error to submit the question whether this was done to the jury. But it must be remembered that Scott gave a different version of the affair from the bank and this conflict in evidence was resolved by the jury against the bank. (*Scott v. McIntyre Co.,* 93 Kan. 508, 513, 144 Pac. 1002.) Of course, if these drafts were taken by the bank as a deposit and placed to the credit of Scott, the wheat became its property. This is thoroughly settled by the decisions in *Scott v. McIntyre Co.,* 93 Kan. 508, 144 Pac. 1002; *Bank v. Sprout,* 104 Kan. 348, 179 Pac. 301; *Mercantile Co. v. Bank,* 105 Kan. 474, 185 Pac. 287; *Lampl Produce Co. v. Hawkins,* 106 Kan. 423, 188 Pac. 233; *Fourth Nat. Bank v. Bragg,* 127 Va. 47, 11 A. L. R. 1034; and 11 A. L. R. 1061, note.

In the Sprout case it was said:

"The drafts were not taken for collection only. The interest to be paid during the suspension period was in effect discount, and the reserved right to charge back the drafts was a right which attaches to commercial paper to protect it, and not to defeat it. . . . The negotiation of the bill of lading vested in the plaintiff all the title to the property which the shipper possessed." (p. 350.)

In the Mercantile Company case the second syllabus reads:

"The indorsement and delivery of a negotiable draft with bill of lading attached implies an intent to transfer the title to the goods, and strong evidence is required to show that the intention was other than these acts indicated." (Syl. ¶ 2.)

In the Lampl case it was said:

"Modern business could not well be conducted at long range, as from Idaho to Kansas, without the highly efficient agency of bank drafts, bank credits, and the assignment and attachment of bills of lading thereto, with the legal and equitable significance which commercial usage accords to these instruments; . . ." (p. 425.)

Instructions were requested to the effect that if the bank placed the drafts to the credit of Scott subject to check it became the owner of the wheat, and that if Scott's account was overdrawn and the overdraft was made good by the credit, it would not deprive the bank of the wheat. These were refused; and the court charged, among other things, that such receipt and entry by the bank to the credit of Scott would make it the owner of the wheat unless the jury further found that it was not a *bona fide* purchaser. By instruction No. 10, the jury were told in substance that if Scott gave the plaintiff worthless checks for the wheat with the intent to defraud him and caused new bills of lading to be issued to himself and indorsed them and turned them over to the bank and was given credit by the bank in the usual course of business, and the bank had knowledge or reason to believe that Scott was insolvent and his account overdrawn and thereafter rescinded its previous actions in regard to the checks by reversing charges and entries, and if the bank received such drafts and bills of lading with knowledge or reason to believe that the wheat had not been paid for when purchased of Burdg, then the bank would not be a *bona fide* purchaser. Various other instructions were given practically charging that if the bank had reason to believe that Scott was trying to defraud Burdg then it was not a *bona fide* holder of the paper. This is not law.

While in some cases erroneous instructions are not sufficient to work a reversal, this should result when such erroneous instructions color the verdict. Unless the bank in taking the bills of lading acted in bad faith it was a *bona fide* holder. The knowledge, had it possessed it, that the wheat had not been paid for when purchased of Burdg would not convict the bank of bad faith. (*Bank v. Reid,* 86 Kan. 245, 120 Pac. 339; *Gigoux v. Moore,* 105 Kan. 361, 184

Burdg v. Scott.

Pac. 637; *Gigoux v. Henderson,* 107 Kan. 325, 190 Pac. 1092; *Thresher Co. v. West,* 108 Kan. 875, 196 Pac. 1061.)

The fact that Scott had been overdrawn at the bank, the fact that checks he had given Burdg were turned down for want of funds, and the fact that certain "kiting" had been indulged in would naturally and probably did have considerable effect on the jury in passing upon the real facts concerning the dealings between the bank and Scott. The erroneous instruction given would naturally influence the jury in reaching their conclusion, and under the circumstances shown, must be deemed to have materially colored the verdict. This means, at least, that the bank did not have a fair trial—a thing every litigant is entitled to. Complaint is made that incompetent evidence was admitted touching certain conversations after the 13th of February, but as these simply disclosed the version the parties concerned placed on the previous transaction and the situation resulting therefrom, no harm was done by their admission.

Other matters are presented and argued, but as the judgment must be reversed for the reasons indicated, no further discussion is deemed necessary.

The judgment is reversed and the cause remanded for further proceedings.

---

## OPINION DENYING A REHEARING.

(Filed July 13, 1922.)

The opinion of the court was delivered by

WEST, J.: The defendant bank, not satisfied with its victory, moves for a rehearing and insists that it was error to submit to the jury the facts touching Scott's transfer of the bills of lading to the bank. We see no reason to depart from what was said on this point in the opinion.

It is further urged that the conversations on February 13 were improperly received in evidence and that unless this ruling is changed it will be the law of the case on another trial. Very well—it might properly be. Also, that we ought to have decided that the plaintiff waived any fraud when he elected to sue Scott for the wheat. We think the case of *Ireland v. Waymire,* 107 Kan. 384, 191 Pac. 304, will enable the trial court to avoid any error on this point should the case be tried again.

Finally, it is said we should have decided the effect of section 23 of the federal bill of lading act (8 U. S. Comp. St. 1916, § 8604*l*), which provides that if goods are delivered to a carrier by the owner or by a person whose act in conveying the title to them to purchaser for value in good faith would bind the owner, and "an order bill is issued for them, they cannot thereafter, while in the possession of the carrier, be attached by garnishment or otherwise . . . unless the bill be first surrendered to the carrier, or its negotiation enjoined. The carrier shall in no such case be compelled to deliver the actual possession of the goods until the bill is surrendered to him or impounded by the court." (39 U. S. Stat. 543.) No authority cited sheds much if any light on the question here presented. It was not necessary to a reversal that this matter be determined, and when it is presented to the trial court possibly some controlling authorities may be found.

The plaintiff also moves for a rehearing and urges that a bill of lading is not a negotiable instrument and that the authorities cited which hold that the purchaser must be shown to have acted in bad faith before his title can be impeached are not applicable. There has been much discussion of the negotiable quality of bills of lading from *Savings Bank v. A. T. & Santa Fé Rld. Co.*, 20 Kan. 519, to *Mercantile Co. v. Bank*, 105 Kan. 474, 185 Pac. 287, where it was said:

"The *bona fide* transfer of the bill of lading for a sufficient consideration carried out the intention of the parties and vested the title and right of possession of the goods in the intervener, and when the plaintiff accepted the bill of lading and paid the draft, it was the end of the transaction." (p. 476.)

In *Bank v. Sprout*, 104 Kan. 348, 179 Pac. 301, it was said of an "order bill of lading":

"*Held*, negotiation of the bill of lading by the shipper vested in the bank title to the goods and right of possession." (Syl.)

In *Harold v. Railway Co.*, 93 Kan. 456, 144 Pac. 823, syllabus, paragraph 1 reads:

"The rule which invests the innocent holder of a bill of lading with rights not available to the shipper, declared in *Savings Bank v. A. T. & Santa Fé Rld. Co.*, 20 Kan. 519; *Railway Co. v. Hutchings*, 78 Kan. 758, 99 Pac. 230, and *Hutchings v. Railway Co.*, 84 Kan. 479, 114 Pac. 1079, is followed in a case where the plaintiff purchased corn described in a bill of lading, and paid the shipper's draft attached to the bill in the usual course of business."

We are told that the federal supreme court in *Shaw v. Railroad*

*Co.*, 101 U. S. 557, held that a bill of lading is not a negotiable instrument. Very true. But we have not followed that decision, as an examination of *Hutchings v. Railway Co.*, 84 Kan. 479, 114 Pac. 1079, will show. It was there said:

"The decision of the federal supreme court in the Shaw case is largely based upon the argument that bills of lading are so little adapted to receive the attributes of full negotiability that a purpose to give them that quality is not readily to be inferred. This argument appeals to us with less force because this court is aligned with those which maintain against the numerical weight of authority, that an innocent purchaser of a bill of lading should stand upon a better footing than the original holder. . . . Treating the bills of lading as strictly negotiable, the fact that they were issued without the actual receipt of the goods constitutes no defense against an innocent purchaser." (pp. 486, 487.)

What then is an innocent purchaser?

"An innocent purchaser is one who by an honest contract or agreement purchases property or acquires an interest therein, without knowledge or means of knowledge sufficient to charge him in law with knowledge of any infirmity in law in the title of the seller." (4 Words and Phrases, Jud. Def. 3629.)

Ruling Case Law, after stating that some courts deny the negotiability of bills of lading and others regard them as *quasi* negotiable, says:

"A well established custom has grown up in commercial circles by which bills of lading as the symbols of title to the property in transit are taken as security for money advanced, and indorsed and delivered as a transfer of the property, generally in connection with, and as security for, the payment of drafts attached thereto." (4 R. C. L. 33.)

"Notwithstanding a bill of lading is designed to pass from hand to hand, with or without indorsement, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Therefore, when it is said that such a bill of lading is negotiable, it is only meant that its true owner may transfer it by indorsement or assignment so as to vest the legal title in the indorsee, for if words of negotiability be contained in them, they only indicate the intention of the shipper as to the person for whose use the consignment is made. A bill of lading does not possess the characteristics of bills of exchange or other negotiable instruments placed upon the footing of bills of exchange, for the latter represent money in commercial usage, and the innocent holder for value in the usual course of trade is protected against all equities of the antecedent parties; whereas the indorsee or assignee of a bill of lading, which is made to the order of the shipper, must trace his title back to and stand on the title of its true owner." (p. 34.)

"A bill of lading is transferable by the custom of merchants so as to vest the transferee with the title of the assignor, and since the assignee can take no greater title than that which existed in the assignor, it follows, as a general

rule, that a *bona fide* purchaser under a defective title cannot claim the property described in the bill of lading as against the true owner. . . . And, so pursuant to the rule, it has been held that a *bona fide* purchaser for value, takes the legal title to property covered by a bill of lading on assignment thereof, free from any adverse claims against the assignor of which such purchaser had no notice. . . ." (pp. 35, 36.)

Whether bills of lading be deemed negotiable or only *quasi* negotiable, no reason or authority appears why one who takes them in the usual course of business should not be held to have taken *bona fide* unless there is a showing of bad faith. Hence, to this extent it must be held that the same rule applies as to bills and notes.

A rehearing is denied.