No. 26,880.

THE KANSAS STATE BANK (SECURITY STATE SAVINGS BANK OF EL DORADO, substituted), *Appellee*, v. THE ATCHISON, TOPEKA · & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING — *Dissolution of Corporation — Closing of Bank by Commissioner*. The taking possession of and closing of a bank by the bank commissioner does not necessarily work a dissolution of the corporation.

2. ABATEMENT AND REVIVAL—*Assignment of Closed Bank's Cause of Action—Substitution of Assignee in Pending Action*. Where the bank commissioner took charge of and closed a bank on January 29, 1924, and July 17 thereafter appointed a receiver, who on September 6 sold claims of the bank which had been sued upon before its closing, it was not error to enter an order on March 23, 1925, reviving the action and substituting for the plaintiff the assignee of the cause of action then pending.

3. BILLS AND NOTES—*Bills of Lading—Negotiability*. In an action by a bank against a railway company to recover the value of oil which had been delivered without surrender to the railway company of the bills of lading, the proceedings considered and *held:* (*a*) The bills of lading were negotiable; (*b*) Under the circumstances narrated in the opinion, there was no bad faith by the bank in accepting the bills of lading.

4. SAME—*Instructions*. The instructions considered and held not to have been erroneous.

5. SAME—*Generally*. Various other alleged errors considered and held not to be of substantial merit.

Appeal from Butler district court; GEORGE J. BENSON, judge. Opinion filed December 11, 1926. Affirmed.

*William R. Smith, Eugene S. Quinton,* both of Topeka, and *Arch F. Williams,* of El Dorado, for the appellant.

*C. A. Leland, L. J. Bond* and *J. B. McKay,* all of El Dorado, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover the value of twenty-two cars of crude oil shipped over the lines of the defendant and delivered without surrender of the bills of lading therefor. Plaintiff prevailed and defendant appeals.

Abatement and Revival, 1 C. J. pp. 144 n. 55, 145 n. 57, 151 n. 3. Banks and Banking, 7 C. J. p. 742 n. 55. Carriers, 10 C. J. pp. 202 n. 27, 208 n. 2. Corporations, 14a C. J. pp. 1118 n. 73, 1119 n. 82. Receivers, 50 L. R. A. n. s. 383; 23 R. C. L. 48.

The facts substantially were as follows:

One C. C. Morgan was engaged in buying crude oil at Tonkawa, Okla., from the Golden Rule Oil Company. The oil was loaded in the defendant's cars, bills of lading issued to Morgan as consignee, "Notify the Sheridan Refining Company," and thereupon sent to the Kansas State Bank with a draft attached, drawn by the Golden Rule Oil Company for the entire purchase price due from Morgan. The bank, upon their arrival, would pay the drafts and thereby become the owner of the bills of lading and the shipments of oil represented thereby. In some instances the bills of lading bore Morgan's indorsement when they reached the bank. Those which were not so indorsed were indorsed on Morgan's behalf by one of the officers of the bank, who had been authorized so to do by Morgan. Morgan had made arrangements to sell the oil to the Sheridan Refining Company, the bank to draw a draft on the refining company for the amount of the purchase and send it with the bill of lading attached to its correspondent at Newkirk, where the refining company would pay the draft and take up the bill of lading. The refining company desired to obtain possession of the oil without paying for it in advance. It therefore furnished the defendant with an indemnity bond, the effect of which was to hold the defendant harmless on account of making delivery of the oil without surrender of the bills of lading. Thereafter the refining company obtained from the defendant the twenty-two shipments in controversy without surrendering the bills of lading which had been, by the bank, handled in its usual manner, that is, by sending the same with a draft attached on the refining company, to its correspondent at Newkirk. The refining company failed to pay for the oil, the drafts being returned protested for nonpayment. The bank asked the defendant to divert the cars which had been consigned to the refining company, and learned that the cars had already been delivered. The bank then made demand on the defendant, after which it brought this action to recover the value of the oil.

Thereafter, on January 29, 1924, the bank was closed by the bank commissioner. On July 17 following, a receiver was appointed, and on September 6 the receiver sold the assets of the bank, among which were the claims sued upon in this action and pending in the district court, to the Security State Savings Bank. Afterwards, on February 13, 1925, the Security Bank filed its motion to revive this action against the defendant and to be substituted for the Kansas State Bank. The motion was allowed March 23, 1925, and an

amended petition later filed; in due course trial was had, resulting in judgment against the defendant.

The defendant maintains that plaintiff, the Kansas State Bank, "died" January 29, 1924, the day the bank was closed by the bank commissioner; that the order of revivor and substitution entered on March 23, 1925, was of no effect because more than one year had elapsed since the death of the plaintiff. Various statutes and authorities cited by defendant in support of its contention have no application to the facts under consideration, and the contention is without merit. The Kansas State Bank was a corporation organized and operating under the laws of Kansas. It cannot properly be said to have gone out of existence until its dissolution. The statute provides two ways by which a corporation may be dissolved: first, by expiration of the time limited in its charter; and second, by judgment of dissolution rendered by a court of competent jurisdiction. (R. S. 17-807.) In the case of banks, a special method for voluntary liquidation is also provided. (R. S. 9-132.) It is not contended, however, that the Kansas State Bank went into voluntary liquidation, nor that the time limited in its charter had expired, nor that a judgment of dissolution had been rendered against it. If it was "killed" January 29, 1924, as maintained by the defendant, it was not killed by the bank commissioner's having taken charge of it under the provisions of R. S. 9-130, which provides that when it appears that a bank is insolvent or has willfully violated any requirements of the banking act, it shall be the duty of the bank commissioner to take charge of such bank. The bank commissioner may appoint a special deputy to take charge of the affairs of an insolvent bank temporarily until a receiver is appointed. Upon taking charge of any bank the bank commissioner shall, as soon as possible, ascertain by an examination into its affairs its actual condition, and whenever he becomes satisfied that it cannot resume business or liquidate its indebtedness to the satisfaction of its creditors he shall forthwith appoint a receiver to wind up its affairs. The statute makes it the duty of the bank commissioner to appoint a receiver forthwith upon having ascertained that it cannot resume business or liquidate its indebtedness to the satisfaction of all its creditors. It will be presumed, in the absence of a showing to the contrary, that the commissioner did his duty and appointed a receiver as soon as he became satisfied the bank could not resume business and liquidate its indebtedness. It would appear, therefore, that the bank commissioner had not determined until about July 17,

1924, that the bank was insolvent and could not resume business. Therefore, it had not "died" before July 17, 1924. When after that its dissolution may have occurred is immaterial so far as the present action is concerned. It was not dead until dissolution.

"Insolvency of a corporation and the appointment of a receiver to manage its business and wind up its affairs do not work a dissolution of the corporation, nor will these things, of themselves, impair its capacity to sue or to enforce judgments previously obtained." (*Leonard v. Hartzler*, 90 Kan. 386, 133 Pac. 570. See, also, *State, ex rel., v. Pipher*, 28 Kan. 127; *Bank v. Sewing Society*, 28 Kan. 423; 14A C. J. 1118, 1119; 8 Fletcher on Corporations, 9056; notes in 2 L. R. A. 256, and 50 L. R. A., n. s., 383.)

The defendant contends that the delivery of the oil without the surrender of the bills of lading was a performance of its contract rather than a breach thereof. It claims that it delivered the shipments of oil in accordance with the terms of an agreement for such delivery entered into at the instance, request and full knowledge of the Kansas State Bank. There was evidence that the refining company asked Morgan to arrange for it a meeting with the officers of the bank for the purpose of arranging for the refining company a line of credit under which the bank would, instead of sending the bills of lading to its correspondent with a draft attached, send the bills direct to the refining company, so that it might obtain possession of the oil without paying the amount of the purchase price in advance; that Morgan arranged the meeting in the office of the bank; that it was attended by Morgan, Ayers, president of the refining company, and the bank's president and cashier; that at the meeting Ayers made his request for a line of credit, which the bank declined; that the president of the bank stated "that the bank absolutely could not give up the bills of lading without their pay." That during this conversation, the president of the bank suggested to Ayers that he had known of instances where under an indemnifying bond the carrier made delivery without surrender of the bills of lading; that Ayers replied that he would endeavor to obtain one; that the bank's president denied that he suggested to Ayers that such a bond be furnished the defendant.

"Q. Mr. Hanna (president of the bank), did you suggest to Mr. Ayers that he go to the Santa Fe and get a contract? A. Absolutely not; the Santa Fe was not mentioned as to this bond or contract in any way whatever that morning.

"Q. And did you make any such suggestion? A. I did not. No, sir."

There was evidence that following this meeting, Morgan and Ayers went to the defendant's office in El Dorado, Kan., and obtained a

Kansas State Bank v. Atchison, T. & S. F. Rly. Co.

form of "indemnity bond for diversion and for delivery of shipper's order freight without bill of lading"; that they took it to Wichita and obtained its execution by the United States Fidelity and Guaranty Company as surety; that the bond was also signed by Morgan as surety; that the bank continued to handle the bills of lading as before, sending them to its correspondent at Newkirk, with draft attached, on the refining company, for the purchase price of such oil..

The defendant stresses the point that the bank knew of the execution of the bond, and contends that it could not have been an innocent purchaser in taking the bills of lading. It is argued that Morgan's relations with the bank were of a very intimate character, and that if a recovery could not be had by Morgan none could be had by the bank. It appears that the bank knew that a bond had been executed to indemnify the defendant in the case of loss arising through delivery of the oil without surrender of the bills of lading, but it was not informed that Morgan had signed the bond as surety. It also appears that the railway company is defending the action because notified by the bonding company to do so. A letter from the defendant to the plaintiff in part reads:

"Further referring to your telegram of August 24, requesting advice as to when you might expect payment of your claim for $12,118.11 for value of 22 cars crude oil consigned to order C. C. Morgan, notify Sheridan Refining Company, Newkirk, Oklahoma.

"We find that this is a transaction involving the interests of three different concerns: viz: The Kansas State Bank, C. C. Morgan, and the United States Fidelity and Guaranty Company. There seems to be considerable variance of opinion as regards the legal responsibilities of each of these parties in the premises, and we have been notified by the representative of the United States Fidelity and Guaranty Company at Kansas City that we should make no payment of claims filed on these 22 cars without first securing their approval. There is a large amount involved in this matter, and of course the railway company in order not to jeopardize its rights against the surety company, must be guided by the notice served upon us by the surety company's representative."

Knowledge by the bank that the bond had been executed to indemnify the defendant was not, of itself, sufficient reason to prevent recovery on the claims. Under the facts and circumstances we find no difficulty in determining that the bills of lading acquired by the bank were negotiable and that the bank did not acquire them in bad faith. (See *Burdg v. Scott*, 111 Kan. 610, 208 Pac. 668; *Bank v. Reid*, 86 Kan. 245, 120 Pac. 339; *Gigoux v. Moore*, 105 Kan. 361, 184 Pac. 637; *Thresher Co. v. West*, 108 Kan. 875, 196 Pac. 1061.)

6—122 Kan.

A contention that the court erred in its instructions need not be dwelt upon at length. The matter has been given due consideration, but no error is discerned which would warrant a reversal.

Complaint is made of other trial errors, but we find none requiring a reversal.

The judgment is affirmed.